**PENBERTHY ELECTROMELT
INTERNATIONAL, INC.,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 437–82C.

United States Claims Court.

Dec. 5, 1986.

Malcolm S. Harris, Seattle, Wash., for plaintiff.

Torrence R. Thomas, Jr., with whom was Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1982). Plaintiff seeks additional sums under its contract with the Department of Energy ("DOE"). The DOE in turn has counterclaimed. After trial of the action and consideration of post trial briefing, the court finds that each party is entitled to relief on part of its claim.

### I. Factual Background

Penberthy Electromelt International, Inc. ("PEI") is a Seattle, Washington, corporation engaged primarily in the manufacture of glass smelting furnaces. The president of PEI is H. Larry Penberthy ("Penberthy"). Penberthy's professional background in chemistry, optics, and glass technology have made him a recognized expert in the area of glass furnaces. In addition, he has had experience making lead oxide glass blocks for use as radiation shielding. In 1952, Penberthy formed PEI, in part to market furnaces employing innovative molybdenum electrodes. It was the possible application of this technology to glassification of nuclear wastes which gave rise to the contract at issue here.

In the mid 1960's, a nuclear processing facility was privately developed in West Valley, New York ("West Valley"). A large quantity of liquid high level nuclear waste was generated and stored at the facility. In the late 1970's Congress directed DOE to stabilize those wastes.

Penberthy heard about the need to stabilize the West Valley wastes, and had conversations with DOE officials concerning the possible use of glass blocks to contain them. In 1978 PEI conducted small scale test melts. In March 1979, PEI submitted an unsolicited proposal to DOE suggesting a detailed plan for glassifying the West Valley wastes in large quantity.

In response to further conversations with DOE officials, in November 1979, PEI submitted a modification of its March proposal, suggesting that it be limited to a demonstration project. The modification divided the project into seven tasks and estimated that completion of all seven would cost $800,000.00.

Penberthy testified that he received a telephone call approximately February 14, 1980, from either Goetz Oertel or James Turi, both DOE officials, informing him that PEI's proposal had been accepted. This was confirmed by a letter of the same date. Penberthy further testified that once he received that call, he had no doubt that a formal contract would soon be signed. Similar testimony was given by Dennis Hotaling, Technical Manager of PEI.

In the period between receipt of the phone call and letter in February, and the signing in June of a letter contract, PEI ordered certain materials which it anticipated using in performance of the contract. Penberthy and Hotaling both testified that it was necessary to order the proper refractories and electrodes as early as possible because they were "long lead" items—i.e., that it would take a substantial amount of time for PEI's source to make them for the project. Penberthy further testified that he had earlier discussed the need to order these items with Turi and Sandra Smith, DOE's assigned Contract Specialist, and had received no objection from them.

The determination of which electrodes and refractory materials to order was based upon test melts done in a very small furnace during the early months of 1980. These melts were done on the assumption

that the nuclear wastes at West Valley would be glassified in a matrix made up of sands from that site. Although a decision was later made not to use those sands, the electrodes and refractories ordered based on those early tests were subsequently used in performing the contract.

Between February and June 1980, negotiations were conducted between Penberthy and Hotaling on behalf of PEI, and Sandra Smith and the contracting officer, Donald Gier, for DOE. Smith testified without contradiction that she informed Penberthy and Hotaling that she was a "Contract Specialist" and not a Contract Officer.

On April 3, 1980, PEI submitted a Contract Pricing Proposal for Task I, setting forth the cost elements for the initial phase of the work. The total amount proposed for Task I was $54,500.00. The following day, PEI sent DOE invoices to cover the refractories and electrodes previously ordered. The cover letter to the invoices asked, "Can you arrange to accept these three invoices in advance of completing the contract? This would help us much."

On June 9, 1980, a letter contract became effective between PEI and DOE. It obligated $112,305.00 to the contract—$50,-000.00 for completion of Task I and $62,-305.00 for the materials previously invoiced. "Understanding" number 5 of the contract stated that the funds obligated to the contract would be the limitation of funds authorized to be expended in performance of the contract. That same understanding required eventual transfer to the defendant of "all materials (including specifications and drawings), and work in progress."

The letter contract contemplated that it would be superseded by a "definitive contract." In the interim, PEI was required, within 30 days, to submit a detailed cost estimate program plan and milestone schedule for the remaining tasks.

On August 6, 1980, PEI submitted a revised Contract Pricing Proposal for Tasks 1 through 7, as well as a Cost Plan and a Milestone Schedule. The total estimated cost plus fixed fee for doing Tasks 1 and 2

was $636,569.00. In calculating this amount, in addition to direct labor and material costs, PEI utilized the following percentages:

fixed fee—17.65%

labor overhead—186%

general and administrative ("G & A") overhead—345%

In none of the documents did PEI indicate that contract work had been done prior to the effective date of the letter contract.

During August and September 1980, an audit was performed on PEI's pricing proposal at the request of DOE by the Defense Contracting Audit Agency ("DCAA"). The audit was prepared by Keith Lanier, who worked with James Mitchell, PEI's controller.

On September 5, 1980, DCAA issued its pre-award audit report on PEI's pricing proposal. Among other things, it concluded that the overhead rates for labor and G & A should be reduced. Specifically, it recommended that G & A overhead be calculated on a base consisting of all direct costs and overhead other than general and administrative expenses, rather than on a base of only direct labor. By using the company's experience during the first seven months of 1980, the rates for labor and G & A overhead were calculated at 154% and 56% respectively.

The pre-award audit contained the following statement:

[W]e consider that period [January—July 1980] to be representative of the indirect costs that should be incurred during CY's 1980 and 1981. However, due to the significant fluctuations in PEI's workload and the attendant fluctuation of its indirect expense rates, we recommend that the contracting officer consider the use of ceiling rates.

Lanier testified that during conversations with Mitchell, they agreed upon the change in PEI's method of calculating G & A overhead, and upon the use of 154% and 56% as the estimated overhead rates.

On September 6, 1980, an amendment to the letter contract was executed to increase

the amount obligated to $175,000.00, to extend the performance period to October 6, 1980, and to authorize purchase of needed equipment and materials up to the obligated amount.

During September, Gier, Sandra Smith, Penberthy and Hotaling continued their negotiations on the terms of the final contract. Two of the primary topics of these negotiations were the amount of PEI's fixed fee, and the overhead rates. Penberthy and Hotaling both testified that PEI normally charged its private commercial customers a fixed fee of 20–25% of costs. In negotiating this contract price, however, PEI proposed a fixed fee of 17.65%. They also testified that Sandra Smith told them that the maximum possible fixed fee was 12% of estimated costs, but that she would be "generous" in arriving at overhead rates, or that she would "make it up" in the overhead. Smith testified that she recalled discussions about DOE being "generous" on the overhead rates, but that it was her recollection that this was in the context of agreeing not to utilize ceiling rates, as recommended in the DCAA pre-award audit.

By the close of the negotiations the parties had agreed in principle to execute a cost plus fixed fee contract for Tasks 1 and 2. The negotiated estimated cost was $583,984.00. Sandra Smith testified that during these negotiations she told Penberthy and Hotaling that the labor overhead rates were provisional and that ultimately PEI would be paid on the basis of its allowable, allocable overhead rates. Hotaling specifically testified that he did not understand at the time that labor and G & A overhead rates then set were provisional. Rather, it was his understanding that

Smith's references to generosity in the overhead rates were reflected in the 154% and 56% rates then established.[1]

On September 29, 1980, the final contract was executed and became effective October 1, 1980. It superseded the letter contract in its entirety. The amount obligated with respect to the contract was raised to $335,000.00. PEI was given an option to proceed with Tasks 3 through 7. Two amendments followed, which, as of March 31, 1981, raised the amount obligated to the contract to $583,984.00, and extended the estimated performance period to May 14, 1981.

After sending six monthly "contract management summary reports" giving DOE financial and other information on the status of performance, on May 7, 1981, PEI sent a letter to DOE requesting reimbursement for a cost overrun in the amount of $125,525.00. The increased costs were due to a change in the type of electrodes used and the associated labor and related overhead charges. The letter also indicated slippage in the estimated time of completion.

On May 14, 1981, amendment A0005 to the contract became effective. It increased the amount obligated by $125,525.00 to $709,509.00. Sandra Smith testified that during conversations with Penberthy about the overrun, she called his attention to the limitations of funds (LOF) clause, and told *him* to avoid another overrun. Hotaling, who at this time had taken over responsibility within PEI for financial management of the contract, testified that he was the person at PEI who spoke with Smith about

---

1. At paragraph 19(b) of the Joint Comprehensive Statement of Facts ("JCSF"), the parties stipulated that Sandra Smith "explained to Messrs. Penberthy and Hotaling that the labor overhead and G & A rates ... were provisional billing rates only and that PEI would be paid the rates actually experienced by it during performance and calculated in accordance with Department of Energy and Federal Procurement Regulations." During trial, plaintiff requested that this stipulation be set aside to the extent it is inconsistent with the testimony. Plaintiff has not provided any basis for avoiding the effect of the stipulation. Moreover, even assuming that the two plaintiff's witnesses did not understand that the rates were provisional, PEI does not contest that they were. Plaintiff's counsel during the trial conceded that the rates were provisional. Indeed, plaintiff's position throughout has been that neither the provisional rates nor the defendant's final audit rates should be used. Even assuming the accuracy of the witnesses' recollection, therefore, their understanding is irrelevant to the final determination of overhead rates.

how to get reimbursement for the overrun, and that she did not refer to the LOF clause in general, or PEI's obligation in particular to notify DOE when 75% of obligated funds were expended. In addition, he testified that he had explained to DOE officials the previous December and January about the need to switch the electrodes.

Contemporaneous with amendment A0005, DOE approved amendment A0006, which added Task 3, increased the estimated time of performance to October 1, 1981, increased the fixed fee to $85,168.00, and obligated a total amount of $920,421.00 for costs and fee. At that time, PEI had invoiced defendant for more than $690,-000.00, and was thus already in excess of 75% of funds obligated to the contract.

On June 23 and 24, 1981, PEI sent two inconsistent telexes to defendant. The first one stated that the "authorized funding still has a favorable balance." The second corrected the earlier telex: "Authorized funding is about $20,000 overspent. We are stopping further operations except for standby power pending instructions."

DOE responded on June 26, 1981, with the following telex:

> Effective June 29, 1981, responsibility for the subject contract is transferred to DOE's Idaho Operations Office. Your point of contact for contractual matters in that office is Dave Letendre, Telephone (208) 526–1950.
>
> Regarding your TLX to me of June 24, 1981, which informed us that you have overrun the authorized funding on the subject contract and suspended operations, you are to continue to stop all further operations except for standby power and incur no additional costs until you receive further instructions from the Idaho office.

The contact point referred to, David Letendre, had, in the interim, taken over from Sandra Smith as Contract Specialist on the PEI contract. The parties stipulate that on June 29, Letendre called Hotaling and told him: that there would be no additional funds to pay for the overrun; that an audit of the contract by the Defense Contract Audit Agency ("DCAA") would be ordered soon; that PEI should not spend any more money; and that PEI should cancel all outstanding orders. This is consistent with Letendre's testimony.

During a second conversation that same day, Letendre told Penberthy the furnace could not be kept running at DOE expense, but that in view of the apparent overspending, DOE was not terminating the contract. This conversation was followed on June 30 by another telex from PEI:

> We acknowledge your oral instructions to halt all expenses and cancel outstanding purchase orders at the same time saying you are not terminating the contract. Please confirm by telex and letter. However, we are not willing to maintain at our expense readiness to resume operations and therefore we hereby give notice of termination of the contract as of midnight 10th July. The furnace will be safeguarded in hot dormant condition until then and cooled in controlled manner to minimize thermal shock on refractory.

DOE responded with its second telex on July 1:

> This is to confirm D. Letendre's oral instructions of 5–29–81 and to reply to your TWX of 7–1–81.
>
> Early notification was not given and therefore there is no funding left to systematically disengage in order to maintain a coherent program. Therefore, you are to (1) stop all work other than the safe shutdown of the furnace which should be completed by 7–10–81, (2) cancel all outstanding orders.
>
> This direction does not constitute a termination as there are no funds remaining.
>
> Our hope is that since the projected needed funding is approximately only 10 percent of the total project cost that perhaps these actions may result in identifying such funding.

PEI's third telex, sent on July 7, acknowledged the July 1 telex and a telephone conversation between Letendre and

Penberthy of the previous day. It stated that all progressive work on the contract was stopped and that the furnace would be held in a hot dormant state at PEI's expense for demonstration purposes until July 14, 1981. On July 28, PEI sent a letter to DOE stating it had successfully tested and operated the furnace, but that it still wished to terminate the contract.

On November 2, Penberthy wrote to DOE:

> I wrote you 28 July 81 asking termination of the above contract because you had ordered a halt in the work and we cannot afford to maintain a crew at our expense ready to jump back in if you decide you want completion.

The letter went on to say that PEI was incurring overhead expenses to keep the contract in "limbo." It further stated that there had recently been interest in investigating the applicability of PEI's technology, and a visit to the furnace by a panel arranged by DOE. In that connection, PEI was willing to demonstrate the furnace in the future.

In the meantime, the audit referred to in Letendre's June 29 phone call was requested of DCAA by DOE on July 15. The DCAA auditor, Ronald Smith, first contacted PEI in early September 1981. He testified that the audit ultimately took 40–45 hours to complete. Since work on it was intermittent, it was not issued in final form until November 25, 1981. He also explained that post-contract audits, such as the one he was doing on PEI's contract, got considerably lower priority at DCAA than pre-award audits.

Smith discussed his preliminary findings with Penberthy and Hotaling on November 6. At that time he told them that it was his view that PEI had been overpaid approximately $180,000.00,[2] primarily because the provisional overhead rates used by PEI in its billings were higher than the actual costs experienced during performance. Since PEI's workload was unusually high during 1980 and 1981, rates during those two years were proportionately less than

they would have been during slack years. Those rates were not recalculated until Smith's audit, when he proposed rates for labor overhead and G & A expenses respectively of 120.4% and 48.6% in 1980, and 87% and 20.2% in 1981.

Since PEI's fiscal year ran from January 1 to December 31, and since Smith's audit was completed before the end of the year, his 1981 calculations were based on partial information. A final audit was completed on September 2, 1983, and primarily differed with the 1981 audit in the overhead rates. By that time Smith had all of PEI's cost figures for 1981, and the final percentages were slightly higher than those in the 1981 audit. Smith concluded that PEI was entitled to the following rates:

|  | 1980 | 1981 |
|---|---|---|
| labor overhead | 120.4 | 105.1 |
| G&A expenses | 48.5 | 27.5 |

Application of these higher rates resulted in a decrease of the government's claim to approximately $135,000.00.

There was testimony that between July 11, 1981, and January 19, 1982,—the last date of any damages claimed by PEI—there were conversations concerning possible additional work on the contract. Specifically, Letendre testified that there were discussions about PEI doing more work, but that this was not in the context of making additional money available. Rather, it was in the context of reimbursing any overpayment discovered through the audit. After the audit, he proposed to Penberthy that PEI suggest "work that he could do for us that would help alleviate that $180,-000.00 overpayment."

On January 5 and 6, 1982, Penberthy met with Letendre at Idaho Falls to discuss the situation. The finance director at Idaho Falls, Earl Jones, was also present. The meeting was requested by Letendre, according to Penberthy, "to negotiate the ending of the contract." Transcript (Tr.) at 140. Penberthy further testified that until that meeting the parties had discussed the

---

**2.** It is undisputed that PEI was paid $892,852.00      of the $920,421.00 obligated to the contract.

possibility of PEI doing additional work on the contract in order to work off the alleged overpayment of overhead. Such projects as the drafting of "as-built" drawings, the completion of task 3, and having the furnace moved at PEI's expense were discussed. However, all such discussions ended as a result of this meeting and the telephone call Penberthy received on January 7, informing him that the furnace was to be removed from PEI's property and no further work would be required.

On December 7, 1981, Mike Arnold of Morrison-Knudson Construction Co. and J. Farley Warren of EG & G visited PEI to check the condition of the furnace in preparation for moving it. They met with Hotaling, who testified that he was not given any definite information as to when—or even if—the furnace would be moved. Then, on January 14 and 15, Warren and Charles Jenkins of Morrison-Knudson returned to PEI for the purpose of finalizing arrangements for the removal. Again the meeting was with Hotaling since Penberthy was out of town on both occasions. It is undisputed that at the latter meeting Hotaling indicated that PEI wanted to be accommodating to DOE's efforts at removal, but that he, unlike Penberthy, was not an officer of the company. The meeting ended with the statement that Jenkins and Warren would return on Monday, January 18 to remove the furnace.

Jenkins and Warren arrived on the morning of the 18th with a work crew to remove the furnace. They were met by Hotaling, who cooperated as they began preparing the furnace for removal. Penberthy arrived later in the morning and stopped the removal attempt. He asked to see some business identification of Warren or Jenkins, which they were unable to provide. When asked for an authorization or delegation by DOE, they did not have one. In fact, one had been prepared but had been left in Idaho.

Penberthy sent a telegram to defendant insisting on certain assurances before work could proceed. In a telephone call to Letendre he stated that PEI required written authorization for the workmen, clarification of liability insurance, a hold harmless agreement, and reimbursement for costs.

Subsequent telephone calls and telexes from DOE were not satisfactory to Penberthy, and he barred any further removal attempts that day. In this action, defendant seeks recovery for its abortive removal effort in the amount of $7,881.86.

Approximately a year and a half later, DOE, with PEI's cooperation, removed the furnace. It was partially dismantled in the removal process, and then discarded by DOE's agents. Eventually plaintiff recovered most of the parts of the furnace.

Both Penberthy and Hotaling testified that despite PEI's efforts to terminate the contract, they felt compelled by the contract to maintain readiness to continue work on the furnace during the period for which PEI claims damages. Under the contract, the defendant would have up to 90 days after imposition of a "stop work" order either to terminate or demand continued performance. Penberthy testified that he felt compelled to be ready to perform at the end of that 90 day period. Hotaling testified that during this period of time there were 27 PEI employees, of whom 17 or 18 had been utilized on the DOE contract. Hotaling testified that 4 or 5 "could have [been] eliminated directly," if no work on the contract had to be done, but that "I could have shifted them over to another job for a short time." Penberthy testified that those employees were kept on until February 1982. However, the only direct labor and material charges tendered by plaintiff for the period after July 11, 1981 and before January 19, 1982 are related to installation of a drain on the furnace, and a meter, and minor rewiring and cleanup.

None of the post-January 19, 1982 actions are the basis for a specific damages claim by either party. However, plaintiff relies on events during this period to support its claim that the credibility of government witnesses is undercut by bias and prejudice directed toward Penberthy. Plaintiff introduced a draft report dated June 18, 1982, prepared by the Office of

Inspector General of DOE. The report had been prepared in response to complaints by Penberthy. It concluded that PEI's proposals "could have been handled in a better manner," that they had technical validity, and that if applied at the proposed Defense Work Processing Facility to be built at the Savannah River nuclear facility, the proposals could result "in a saving of about $100 million in capital costs."

## II. Analysis

At the outset, the court rejects plaintiff's argument that defendant's post-contract actions demonstrate such a degree of bias or prejudice as to warrant discounting testimony by defendant's witnesses. Even assuming, without deciding, that defendant acted unwisely in rejecting plaintiff's technology, and in unnecessarily destroying the furnace, these factors do not demonstrate a sufficient degree of ill will or animus to discount any particular testimony. *Cf. United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 468, 83 L.Ed.2d 450 (1984); *Carstens v. Nuclear Regulatory Commission,* 742 F.2d 1546, 1560 (D.C.Cir. 1984); *Sangemino v. United States,* 227 Ct.Cl. 64, 645 F.2d 45 (1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 305 (1982). Moreover, none of these assertions are specifically directed at challenging any particular witness. Finally, the only relevant credibility conflict resolved in defendant's favor herein involves Ronald Smith, who the court concludes is a believable, unbiased witness.

### A. Pre-Contract Costs

Plaintiff seeks $33,603.00 for costs incurred prior to execution of the letter contract on June 9, 1980. Of this amount $402.00 is for material, and $9,209.00 for direct labor. The balance of $23,992.00 represents labor overhead expenses and G & A calculated at the rates currently asserted by plaintiff.

The applicable regulation, 41 C.F.R. § 1–15.205–30 (1980), allows reimbursement of pre-contract costs when certain requirements are met:

Precontract costs are those incurred prior to the effective date of the contract directly pursuant to the negotiation and in anticipation of the award of the contract where such incurrence is necessary to comply with the proposed contract delivery schedule. Such costs are allowable to the extent that they would have been allowable if incurred after the date of the contract.

From this, a three-part test can be distilled. Precontract costs are allowable to the extent they:

1. are incurred in order to meet the contract delivery schedule,

2. are incurred directly pursuant to the negotiation and in anticipation of the award, and

3. would have been allowable if incurred during contract performance.

Hotaling testified that plaintiff's exhibit 116, reflecting PEI's current claim, accurately reflects time allocable to research work on the anticipated DOE contract in early 1980. He stated that the figures were based on job cost ledgers and time cards. Hotaling certified that all of the time claimed was related solely to the West Valley project. He and Penberthy both testified that the work involved testing materials and equipment in order to select the transformers and refractory surfaces which were ultimately ordered and used in the actual furnace. Plaintiff's exhibit 114, also attached to the government's September 2, 1983, audit report ("1983 audit"), specifically describes the work done during this period.

Plaintiff further testified that because of potential delay, the materials necessary for the contract had to be ordered as early as possible, hence the research was done in order to expedite the eventual contract schedule. Defendant has not disputed the utility of the research. In fact, the costs of materials selected as a result of the precontract work were paid for immediately upon execution of the letter contract. The court finds that the costs were incurred to insure that PEI could meet the anticipated contract delivery schedule.

Nor has defendant seriously disputed the allowability of the material and labor charges, assuming they had been submitted for the contract period. The charges are supported by Hotaling's testimony that he pulled the material and labor charges off cards designated with the research project that led to ordering the contract materials. Hence, the court finds that the third prong of the test is met.

The principal question as to these costs is whether they were "pursuant to the negotiation and in anticipation of the award." The case law appears to view these phrases in tandem. *See, e.g., Bell Aircraft Corp. v. United States,* 120 Ct.Cl. 398, 100 F.Supp. 661 (1951); *National Committee on International Trade Documentation,* DOTCAB No. 76–28, 77–1 BCA ¶ 12,368, at 59,859 (1977); *see also United Technology Center,* ASBCA No. 12007, 68–2 BCA ¶ 7350 (1968) (disallowing certain costs incurred prior to contract award because no discussion of such items during negotiations).

The court concludes that the material and labor expenses in question were necessary to perfect the terms of the anticipated contract. Plaintiff had been told four months before the letter contract was executed that its proposal had been accepted. During the period of the negotiations plaintiff informed defendant of the need to order long lead items, pursuant to which the costs at issue were incurred, and defendant agreed to fund their purchase ahead of schedule. Moreover, it is undisputed that the work was done in anticipation of this contract and during the period when discussions leading to a final contract were proceeding. *Cf. Codex Corp.,* ASBCA No. 17983, 74–2 BCA ¶ 10,827, *mot. for recon. denied,* 75–2 BCA ¶ 11,554 (1975) (precontract costs disallowed since negotiations did not begin until well after costs incurred; they were incurred with hope that items would be sold under any contract).

**3.** Defendant also noted that plaintiff did not assert these costs at the time they were incurred. While that is true, such a delay in making a claim is insufficient reason by itself to disallow it. *See Thiokol Chemical Corp.,* ASBCA

Defendant asserts, however, that the fact that Task 1 of the contract included research and development shows that it has already paid all such costs. It argues that in the absence of a prior agreement to pay, the government should not be liable. The court disagrees. Hotaling and Penberthy's testimony was specific on the allocability of these costs to this contract and their necessity in meeting the contract schedule. While under 41 C.F.R. § 1–15.-107 (1980) it is desirable that contractors seek advance agreement with the government as to the treatment to be accorded precontract costs, the regulation does not require it as a precondition to recovery, assuming the other requirements are met. Given the above findings, failure to reach an advance agreement and defendant's unsupported speculation that it is being double billed are insufficient to overcome plaintiff's showing.[3] *See Rockwell International Corp.,* ASBCA No. 20304, 76–2 BCA ¶ 13,131 at 58,302 (1976) (where the government seeks to disallow a cost as unallowable under the regulations, and the nature, amount, and allocability of the charge are not at issue or are proven, the burden is on the government to establish the propriety of such disallowance).

Accordingly, plaintiff is entitled to recover on its claim for precontract costs. However, as noted, plaintiff's claim for $33,-603.00 is based in part on the application of contested overhead rates. In a subsequent section of this opinion the court finds that the rates computed by defendant are proper. Thus, the court finds that plaintiff is entitled to recover on this claim as follows:

| | |
|---|---|
| Direct Materials | $ 402.00 |
| Direct Labor | 9,209.00 |
| Labor Overhead (120.4% of Direct Labor) | 11,088.00 |
| Subtotal | $20,699.00 |
| G & A Overhead (48.5% of Subtotal) | 10,039.00 |
| Total | $30,738.00 |

No. 17544, 76–1 BCA ¶ 11,731 (1976) (cost of residual inventory acquired under previous contracts and then transferred to contract at issue allowed, even though transfer not recorded until ten months after termination).

B. Direct Labor Charges, June 9, 1980—July 10, 1981

There is no dispute that during this period of time the contract was being performed. Nor is there any disagreement between the parties that $282,505.00 was properly charged for direct materials during the period. The parties do disagree, however, on the direct labor cost chargeable to the contract. Plaintiff asserts that the figure should be $121,826.00, while defendant places it at $111,461.00, leaving $10,365.00 in dispute.

Hotaling testified that plaintiff's exhibit 79 was a data packet which he prepared and sent to DOE to specify all of the costs charged to this contract. The third, fourth, and fifth sheets of that packet list the direct labor charges for the period. Hotaling explained that the sheets list the names of each employee assigned to work on the project, their hourly rate of pay, the number of hours worked by them each month on the project, and the cumulative total cost. The charges listed were taken from the time cards kept in the normal course of business by PEI and reflect only the time charged to this contract.

The dispute centers on those charges resulting from changes made on time records after the original billings. Defendant's position as to these charges is set forth in the 1983 audit. At page 2 of the report it states that the costs originally charged were based on costs reflected in PEI's job cost records, which are maintained on a memorandum basis. Because the government's examination of those records "disclosed no significant errors or exceptions in the job cost records" it "believe[d] that they are the most reliable record maintained by Penberthy." The report further noted that some of the time cards merely had the original PEI accounting number crossed off and the number for this contract written in without explanation, and that while other cards did contain "brief descriptions," the auditor was unable to relate the descriptions to the contract. The report concluded at page 8 that "[i]n our opinion PEI has not demonstrated that the time cards were incorrect and, therefore, we believe that the original jobs cost records represent the most accurate accumulation of allowable labor costs."

Defendant presented no testimony or other evidence challenging the propriety of any single charge, but disallowed all charges beyond the original ones because of its view as to their general reliability. In contrast, Hotaling, who was responsible for the day to day work on the contract, testified that on the basis of his knowledge of the work PEI employees were doing at the time, he could correct the cards to reflect the project to which that work was actually chargeable. Some cards originally had descriptions such as "sampler furnace" or "resistivity" or "control drain," all of which, testimony showed, related to the instant contract. In addition, many of the charges in September or October 1980 related to work on a "rock melter" which had been built for an earlier contract but was modified for, and used during this contract. Hotaling was certain that all of the cards with the number of the earlier contract were in fact properly charged to DOE because the other contract had been completed the previous spring. He also testified to two other similar circumstances where changes were made.

The court finds that Hotaling's testimony was specific, straightforward, and unhesitating; that he was in the best position to know what work was being done on the contract at any time; and that his testimony clarified the "brief descriptions" referenced in the audit report, showing them indeed to reflect work done on this contract. Moreover, Hotaling's testimony was supported in part by Frank James, a certified public accountant (CPA) who sample checked the entries in the data packet and found them to be accurate.

The government's position, unsupported by any specific challenges, is clearly outweighed by this testimony and the relevant exhibits. Plaintiff, therefore, is entitled to reimbursement for the entire direct labor charge billed to the government, constituting an additional $10,365.00 beyond what

has already been paid. In addition, the overhead rates found proper in the next section of this opinion must be applied to the additional recovery. For the $8,972.00 in additional direct labor charges for 1980, a labor overhead rate of 120.4% and a G & A rate of 48.5% apply. For the $1,393.00 in additional direct labor charges for 1981 found proper here, a labor overhead rate of 105.1% and a G & A rate of 27.5% apply. Plaintiff's total recovery on this claim, therefore, is $33,007.00.

## C. Overhead Charges, June 9, 1980—July 11, 1981

In its counterclaim, defendant seeks recovery of a portion of the overhead charges paid for work done between June 9, 1980, and July 11, 1981. It contends that it is entitled to recoup $134,728.00 based on the difference between the provisional overhead rates and those for 1980 and 1981 calculated through the post-contract audits.

▉ As discussed above, the contract at issue here was one for costs plus a fixed fee. Based on the results of the pre-award audit, the rates at which the overheads were to be billed initially were 154% (labor) and 56% (G & A). There is no real question that these rates were provisional and that reimbursement eventually had to reflect actual cost experience. Plaintiff contends, however, that defendant's final audit calculated actual overheads improperly.

The parties stipulated (JCSF No. 19) that Penberthy and Hotaling were told that the initial overhead rates "were provisional billing rates only and that *PEI would be paid the rates actually experienced by it during performance* and calculated in accordance with the [applicable] Regulation." (Emphasis supplied.) Both parties agree that the relevant regulation is 41 C.F.R. § 1–15.203(e) (1980) ("§ 203(e)"), which provides:

(e) A base period for allocation of indirect costs is the period during which such costs are incurred and accumulated for distribution to work performance in that period. Normally, the base period will be the contractor's fiscal year; however, use of a shorter period may be appropriate in case of (1) contracts whose performance involves only a minor portion of the fiscal year, or (2) where it is general practice in the industry to use a shorter period. *In any event the base period or periods shall be so selected as to avoid inequities in the allocation of costs.* When the contract is performed over an extended period of time, as many such base periods will be used as will be required to represent the period of contract performance. (Emphasis added.)[4]

Plaintiff's main argument with respect to overhead is that the indirect costs associated with this contract should be the average of its overhead costs between 1979 and 1982. Plaintiff's argument rests on the underscored language in § 203(e). PEI's contention is that the critical requirement of the regulation is that inequities be avoided, and that the way to do that in this case is to use a four year base period. Plaintiff does not cite any precedent construing § 203(e) in this fashion. It also contends that work was performed on the contract during all four years, so that use of a four year base period is proper for that reason as well.

Using its method, plaintiff concludes that a single rate for labor overhead, 153%, and a single rate for G & A expenses, 42.6%, should be applied to all costs, whenever they were incurred.

Plaintiff relied on James' testimony. He compiled plaintiff's exhibit 122, a calculation of overhead percentages for PEI for calendar years 1977 through 1982. He testified that a four year base period was more equitable than a two year base, par-

4. In their JCSF the parties reprinted the regulation as it appeared in October 1980. Plaintiff asserted at trial that the version in effect in June 1980 should control because the letter contract was signed in that month. Defendant contended that the modified version should apply be-cause the letter contract was superseded by the definitive contract in October 1980. Because the court finds that the same result obtains regardless of which form of the regulation is used, the June version is quoted.

ticularly for a company like PEI which intermittently has a few large contracts. For such a company the presence or absence of one contract results in wide variations of sales volumes and therefore a much broader or narrower base of direct costs to which indirect costs may be allocated. That, in turn, causes substantial fluctuations in overhead rates despite the fact that in real dollar terms overhead costs may remain relatively constant. Review of plaintiff's exhibit 122 supports his testimony that the G & A and labor overhead rates were lower in 1980 and 1981 than for the other years between 1977 and 1982.

This testimony was consistent with that of other witnesses for plaintiff. Hotaling testified that PEI's sales volume in 1980 and 1981 was unusually high. Penberthy stated that the number of employees during this period—27—was higher than the norm—20. Moreover it is consistent with defendant's precontract audit which recognized "significant fluctuations in PEI's workload and the attendant fluctuation of its indirect expense rates."

If the relevant issue were, "Do plaintiff's or defendant's rates best reflect average overhead costs for PEI?," there is little argument that plaintiff would prevail. That, however, is not the issue. Plaintiff's argument fails for two reasons. First, plaintiff's concept of "equity" flies squarely in the face of the principle of cost allocability. There are only two types of costs, direct and indirect. Both must be allocable to the contract. 41 C.F.R. § 1–15.201–1, –4 (1981). By definition, plaintiff's proposal violates this requirement. The entire premise of plaintiff's argument is the necessity to reach beyond the period of costs for *this* contract because the period is anomalous. To make overhead rates non-anomalous, plaintiff wants to frame the contract period with two years of "normal" conditions and thus ameliorate the effect of the sales volume generated by the DOE contract.

Defendant contracted, however, to pay costs plus a fixed fee for the development of the furnace. Plaintiff was thereby guaranteed reimbursement for all of its expenses necessarily incurred in performing the contract, in return for which defendant was obligated to pay only such costs. It did not also agree to pay additional amounts to subsidize plaintiff's operations outside the contract period, just as it could not have avoided its commitment to pay actual costs during performance if plaintiff's operations in other years had led to lower overheads in the pre- and post-contract periods. Only if plaintiff could show that costs in 1979 and 1982 were attributable to this contract would those years be relevant to determination of the base period(s).

The court finds that all compensable contract work took place during the years 1980 and 1981. Both sides concede that the contract period in question began, excluding pre-contract costs, in June 1980, and that it ended sometime on or before January 19, 1982. Plaintiff's fiscal year is the calendar year. Thus, by choosing 1980 and 1981 in fixing overhead rates, defendant was for all practical purposes bracketing plaintiff's period of contract performance.[5] The court concludes therefore that plaintiff's rates are inconsistent with the principle of cost allocability.

■ Second, plaintiff's interpretation takes the highlighted phrase out of context and thereby misinterprets § 203(e). It totally ignores the overall structure and content of the balance of the paragraph. The least strained reading of § 203(e) is to treat the opening sentence as a general definitional statement which sets out the broad parameters any base period must meet—it must be a period *during which contract costs are incurred.* Next follows a presumption: normally the base period will be the contractor's fiscal year. The presumption has an exception, but it operates only

---

5. Contract performance ended in July 1981. Thus the period January 1980 to December 1981 actually creates a six-month cushion at either end of performance and thus somewhat ameliorates the peculiarity of the low overhead rates for the contract period.

in the direction of making the base period *less* than a fiscal year.

In this context, then the phrase "[i]n any event" appears, followed by the admonition to avoid inequity. It is clear that the language plaintiff relies upon clarifies and limits the presumption and its exception. However, a plain reading of the paragraph shows that the presumption, the exception, *and* the admonition are all subordinate to the opening sentence. The sentence which plaintiff relies upon cannot become the polestar of the paragraph without in effect reading out the requirement of the first sentence that the base period(s) be one(s) within which contract work was performed.

Plaintiff has been unable to cite any cases adopting its reading of the regulation or using a multi-year base period. Although none of the cases cited by defendant are squarely on point, they support its position and the court's analysis. All appear to limit overhead calculation to the contract period, and are supportive of breaking multi-year contract performance into separate years, which, unlike plaintiff, defendant did here.[6] *See generally Biospherics, Inc.,* AEC BCA No. 102–7–73, 73–2 BCA ¶ 10,267 (1973); *Nash-Hammond, Inc.,* ASBCA No. 15563, 71–2 BCA ¶ 9116 (1971); *Associated Aero Science Laboratories, Inc.,* ASBCA No. 6618, 67–2 BCA ¶ 6618 (1967); *J. Douglas Corey, Trustee in Bankruptcy for Robertson Electric Co.,* ASBCA No. 4715, 67–1 BCA ¶ 6391 (1967); *Brown Engineering Co.,* ASBCA Nos. 6830 and 6831, 61–2 BCA ¶ 3225 (1961); and *Daystrom Instrument Division of Daystrom,* ASBCA No. 3438, 58–1 BCA ¶ 1558 (1958). The court concludes, therefore, that defendant's construction of § 203(e) is proper, and that plaintiff's is not.

One issue remains with respect to calculation of overhead rates. That involves plaintiff's assertion that DCAA's methodology erroneously accounts for research and development labor. The plain-

tiff's post trial brief states that the "heart of PEI's two disputes with the overhead rate methodology proposed by DOE is DCAA's treatment of research and development labor." This argument has not been pleaded before. The court is unable to find any reference to it in the complaint, in the JCSF, or in the Joint Statement of Issues of Fact and Law. Plaintiff's counsel was asked during opening argument whether, assuming the court used either the two or four year base for calculating overhead, there was "any dispute as to the accuracy of either side's computation of overhead? ... [I]s plaintiff going to dispute the calculation of the defendant's overhead rates?" Plaintiff's counsel responded, "I don't believe there's any dispute about the Joint Comprehensive Statement of Facts."

Later, when defendant's counsel was examining Lanier about the methodology originally proposed by Mitchell for setting 1979 overhead rates, plaintiff's counsel, Mr. Harris, objected on the basis of relevance, whereupon the following colloquy took place:

MR. HARRIS: The dispute is not about the methodology, it's about the overhead rates and the means for picking the base periods for those overhead rates. That's the only reason we have different results here. We did not seek to press this methodology up front. *Once this other one was recommended by Mr. Lanier, it was adopted and we never questioned it and we've never questioned it since.* It's merely the assumptions that are made about base periods to apply that methodology. That's the only dispute that we have.

THE COURT: That's been my understanding so far....

The relevance dispute, as I understand it, has to do with what the base period is as opposed to what categories of work or materials or labor go into the calculation.... Now if there's not any dispute

---

**6.** In focusing on the penultimate sentence of § 203(e), plaintiff ignores the final sentence which, even accepting the relevance of 1979 and

1982 overheads, would still require four individual base periods rather than one.

about that, I'm not sure that I see the relevance.

MR. THOMAS: There is a dispute about that.

Tr. 153–54 (emphasis added). Subsequently, in its redirect examination of James, plaintiff for the first time put on testimony in an effort to challenge the *components* of defendant's overhead methodology.

Defendant arguably broached this issue in its examination of Lanier. In any event, the colloquy quoted above shows that defendant's counsel was more prescient about plaintiff's argument than was plaintiff's counsel. The issue thus will be deemed tried by consent, and the court will address it.

■ The most direct manifestation of plaintiff's theory is in defendant's exhibit 63, which is a side by side comparison of PEI's initial proposed methodology with that used in the DCAA audits in question. In brief, the methodologies arrive at substantially different overhead rates primarily because the direct labor and G & A bases used by the DCAA contain more cost categories than the ones proposed by plaintiff. The G & A base, for example, includes material costs and manufacturing and engineering overhead; PEI's proposal did not.

Lanier testified that PEI's methodology was improper for a number of reasons. It did not provide for recouping engineering overhead or research and development costs; it did not capture material overhead costs in the G & A base; and the same base (direct labor) was used as both the labor overhead and G & A overhead base. Although some of the DCAA's changes to PEI's formula operated to plaintiff's advantage, the primary effect was to increase the G & A rate and spread its recovery over only the labor-oriented part of PEI's business. Lanier felt this was improper, since PEI also had a substantial volume of non-labor intensive resale business.

Lanier is a supervisory auditor with DCAA, with over 20 years' experience involving hundreds of audits. He stated that he used generally accepted auditing principles in his audits. Moreover, Lanier testified that PEI's accountant during the relevant period, Mitchell, agreed to drop the methodology initially proposed by PEI, and to use DCAA's formula for calculating overheads. Mitchell did not testify. Ronald Smith, another DCAA auditor, also testified as to the appropriateness of using the DCAA methodology in defendant's exhibit 63.

In response, James, who has been a public accountant since 1977, testified that he found fault with the DCAA methodology. In analyzing that testimony closely, the court concludes that for a number of reasons it is unpersuasive. First, while the court is persuaded that the competing formulas yield different results, James' testimony provides no clear rationale for why the DCAA methodology was improper. James also admits that the methodology he advocates was not used by PEI itself. It arose after the contract was completed and apparently was not utilized in any contract cost submission. This is consistent with Mitchell's acquiescence.

In addition, James' testimony was less than unequivocal. When asked whether defendant's methodology conflicted with financial accounting standards, he initially said they were contrary, but immediately qualified that—"at least in spirit." Further, James prepared plaintiff's exhibit 122 to demonstrate how his overhead rates were calculated, and, although average rates for 2, 3, 5, and 6 year periods are shown, inexplicably, figures for the four year period including 1979–1982, the only one directly relevant to plaintiff's claim, were not. While he did sample checking of plaintiff's books and records, unlike the DCAA, he did not do an audit of PEI.

Moreover, James' testimony elsewhere was not persuasive. He testified both that PEI's books and records were as good as the records of most small businesses, and yet that Mitchell, Hotaling and Penberthy were all deficient in accounting knowledge, and that PEI's accounting methods were "primitive." His testimony with respect to

how to categorize certain labor costs lacked precision. Despite lengthy testimony as to the inequity of not using a four-year base period in this action, and experience with other government contracts, he was unaware of any other use of multiple year base periods. Although he stated that "in effect we're getting by using the defendant's method, a double counting of overhead applied against that R & D expense," when asked to certify that PEI's claim for unabsorbed overhead, admittedly not the method he used for the same period of time, also did not result in double counting costs, he answered: "No, I cannot certify that."

The court concludes that James' testimony, particularly in light of Mitchell's acquiescence and the peculiar way in which plaintiff raised this issue, is insufficient to overcome defendant's showing that the overhead formulas and figures it employed in the final audit were proper. Defendant is therefore entitled to recover $134,728.00 on this part of its counterclaim.

### D. Post July 11, 1981 Costs and Overhead [7]

Plaintiff claims two types of costs for the period after its June 23 notification that spending on the contract exceeded obligated funds. It claims labor and material costs in the amount of $26,061.00, primarily for installation of a new drain, some rewiring, and other maintenance work. In addition, it seeks approximately $20,000.00 per month for overhead [8] during the period plaintiff claims it was unable to work on the contract, and was unsuccessful in terminating.

---

7. The precise date for "termination" of the contract does not need to be determined. Neither party contends that the contract ended in June or July 1981, but both parties concede that a contract relationship had ended by January 19, 1982. The court finds that plaintiff was not required to *perform work* on the contract beyond July 11, 1981. The relationship between the parties continued to be controlled by the terms of the contract beyond that period, however.

Both parties place great reliance on two contract provisions, apparently on the assumption that their relationship is controlled by their operation—the LOF clause, with its attendant notification requirement, and the stop work order clause. The court concludes that neither provision directly controls the allowability of post July 11 costs.

### 1. The Limitation of Funds Clause

General Provision (GP) 2 of the contract is the LOF clause. It provides, in part, that if at any time PEI had reason to believe that the costs it expected to incur in the following 90 days, when added to all costs previously incurred, would exceed 75% of the total amount allotted to the contract, it had to notify defendant in writing. There is no question that plaintiff never sent a document purporting to be such a notice. There is also no question that, based on its billings, at some point well before June 23, plaintiff should have sent notice to the defendant that funds spent were about to reach the 75% level. The final audit report of September 2, 1983 states that even based on PEI's own billing system, that point was reached in February, 1981. This was, of course, prior to the addition of approximately $325,000.00 to the obligated funds in May 1981.

Plaintiff contends that it should have been apparent to defendant from both its monthly contract status reports and from the May overrun that the 75% figure had been reached well before June 23. It concludes therefore that defendant had constructive notice in a manner that satisfied the requirement of GP-2.

The court concludes that it does not need

---

8. Plaintiff originally billed a flat rate of $23,000.00 per month as unabsorbed overhead but has abandoned that claim in favor of its current charges. The record does not reflect either a detailed basis for the original billing or a clear explanation of the differences between the earlier and later charges.

to resolve the question.[9] Under either scenario—whether defendant had constructive notice or not—plaintiff's entitlement to recovery, under the circumstances here, is not affected. Failure to give notice could only bar plaintiff's recovery to the extent that it would exceed the funds obligated to the contract.[10] Since the court elsewhere rejects certain of plaintiff's claims, and finds for defendant in part on its counterclaim, the total amount of funds to which plaintiff is entitled does not exceed $920,-421.00. The LOF clause therefore does not independently limit plaintiff's recovery.

### 2. The Stop Work Order Clause

■ GP-49 is the contract stop work order clause. It gives the contracting officer discretion to issue a written stop work order for a period of 90 days, or longer if agreed to by the contractor. If an order is issued, the contractor must take all reasonable steps to minimize costs. Within the 90 day period the contracting officer must either cancel the stop work order or terminate the contract. If a stop work order is cancelled, the contractor must resume work, whereupon it is entitled to an equitable adjustment if the stop work order resulted in an increase in time or cost to the contractor, and if the contractor asserts the claim within 30 days of the end of the work stoppage.

Plaintiff's telegram of June 23 announced that authorized funding was overspent and, "[w]e are stopping further operations." Defendant's response acknowledges the telegram and states, "you are to continue to stop all further operations except for standby power and incur no additional costs until you receive further instructions." Plaintiff's June 30 reply states that "we are not willing to maintain at our expense readiness to resume operations and ... give notice of termination as of [July 10]." Defendant's telegram of July 1 made reference to failure to abide by the LOF notifications requirement, and then directed plaintiff to "stop all work

other than the safe shutdown of the furnace, which should be completed by 7–20–81.... cancel all outstanding orders." It went on to recite that the telegram did "not constitute a termination as there are no funds remaining," and that defendant had requested a DCAA audit, since the hope was that "these actions may result in identifying such funding," i.e., money available from amounts already paid to complete the contract.

Plaintiff points to these events as constituting a stop work order. In further support, it cites the Inspector General report and the 1983 audit, both documents prepared by defendant, which refer to the July 1 telegram as a stop work order.

The court disagrees. There can be no question that a stop work order was never issued *pursuant to GP-49.* The plain but unspoken assumption behind GP-49 is that the contractor is performing its work and is interrupted by defendant. Here, *plaintiff* initiated the work stoppage. The clause also requires that the stop work order "be specifically identified as a stop work order pursuant to this clause." Defendant's response did not invoke GP-49. Moreover, PEI initially treated the contract as terminated and has continued to refuse to do any additional work absent new funds. While DOE refused to terminate, it stated that it was unnecessary to do so since there was no money, at least according to plaintiff's calculations, to allow any further work. Finally, plaintiff never requested a cancellation or other action pursuant to GP-49 and defendant took no such actions. Under these circumstances, it is clear that neither party was operating under the stop work clause.

■ The fact that the stop work clause was not invoked, and that the LOF clause is not directly applicable, however, does not end the inquiry. If in fact the government caused a work delay, then plaintiff might still be entitled to recover. *Consolidated Molded Products Co. v. United States,* 220

---

**9.** However, see note 12, *infra.*

**10.** *See* GP-2(c), (d); *C & L Const. Co. v. United States,* 6 Cl.Ct. 791, 806 (1984).

Ct.Cl. 594, 601–02, 600 F.2d 793, 798–99 (1979). A review of court and board decisions arising out of different though somewhat analogous circumstances leads the court to conclude that in the absence of a directly applicable "stop work" or "suspension of work" clause,[11] the most appropriate inquiry is whether defendant caused a constructive suspension. *Cf. S.A. Healy Co. v. United States,* 216 Ct.Cl. 172, 189–192, 576 F.2d 299, 307–08 (1978); *Merritt-Chapman and Scott Corp. v. United States,* 192 Ct.Cl. 848, 429 F.2d 431 (1970); *Fritz-Rumer-Cook Co. v. United States,* 279 F.2d 200 (6th Cir.1960); *Winston Brothers v. United States,* 131 Ct.Cl. 245, 130 F.Supp. 374 (1955); *Chalender v. United States,* 127 Ct.Cl. 557, 119 F.Supp. 186 (1954); *First Line Manufacturing Inc.,* ASBCA Nos. 24443, 24444, 83–1 BCA ¶ 16,394, at 81,500–01 (1983); *International Builders Inc.,* FAACAP No. 67–5, 71–1 BCA ¶ 8790 (1971). For plaintiff to recover, it must show that at a time during which it was ready and willing to perform contract work, it incurred reasonable and unavoidable costs because of defendant's improper delay in either finally terminating the contract, or giving notice to proceed with work.

Plaintiff cannot meet this test for a number of independent reasons. First, the court concludes that although the contract entered a period of constructive suspension of performance, the delay, at least initially, was caused by plaintiff. There is no question that the immediate cause of the dispute the parties are presently in is plaintiff's failure to keep better books. During the first part of the contract period plaintiff used an accountant part time, James Mitchell, and a bookkeeper, Mary Storm, to keep its books and prepare financial reports on the DOE contract. Mitchell gave up his position with PEI by March 1982. Although plaintiff hired an accountant, Ray Roe, to replace Mitchell, he was not given any responsibility for the contract. Instead, the financial responsibilities for the contract fell on Hotaling, who admitted that he did not have "any accounting training."

Further, as the court has already noted, plaintiff's own accounting expert witness, James, stated that "Mr. Mitchell, Mr. Penberthy, Mr. Hotaling, while they are all fine individuals, are deficient in accounting knowledge ... they got into something they did not fully understand." In light of this statement his earlier description of plaintiff's books as being "as good as the records of most small businesses," loses impact.

In addition, Hotaling admitted that the use of a cash accounting basis rather than an accrual basis led to PEI's erroneous first telegram of June 23 reciting that there was a favorable balance in authorized funding. As Hotaling did a "more extensive search" he realized the post-March financial statements only reflected paid, rather than billed, invoices. Based on the overhead rates then used, this "oversight" led to the second telegram stating that authorized funding "is about $20,000 overspent."

A second related error by plaintiff was in not sending a notice that 75% of obligated funds had been exceeded. Regardless of whether defendant should or should not have been on constructive notice[12] of the amount remaining under the contract, (albeit on a false premise—the cash basis), a timely formal notification under the LOF clause would have had the salutary effect of forcing defendant to adhere to the procedures of that clause and could potentially have eliminated much of the subsequent ambiguity about funding.

Finally, if plaintiff had kept track of its actual overhead expenses throughout the contract, or at least refigured just the 1980

---

11. GP–31 deals with "excusable delays." It is not applicable to the present circumstances.

12. In any event, plaintiff's position appears not to be supported in the case law. *See Consulting Services Corp.,* ASBCA No. 20288, 76–2 BCA ¶ 12,124 (1976); *Industrial Tech. Assoc.,* ASBCA No. 16075, 72–2 BCA ¶ 9531 (1972); *Optonetics, Inc.,* ASBCA No. 17015, 73–2 BCA ¶ 10,173 (1973).

overhead, additional confusion which arose in July as to whether in fact there was an overrun would have been avoided, or certainly minimized.[13] As found earlier, the initial overhead and G & A rates were provisional. Certainly by the end of 1980, the plaintiff could have calculated that year's actual costs. The difference for that year alone (120.4% labor overhead versus 154%; 48.5% G & A versus 56%) would have more than eliminated the cost overrun projected in the second telegram of June 23.

In sum, the work stoppage was occasioned by plaintiff, not defendant. Unless plaintiff has demonstrated that at some point the responsibility for delay shifted to defendant, *and* that plaintiff was willing to perform additional work, it cannot recover.

Plaintiff has stipulated that both Hotaling and Penberthy were told as early as June 29, 1981, that no *additional* monies would be forthcoming to fund the overrun. Letendre is also emphatic in that regard. Plaintiff points to a comment in Letendre's personal notes kept during this period of time that there was a "possibility of more money from headquarters." This entry was made on June 29, 1981, which by stipulation, is the same day on which Letendre told Hotaling that no additional funds would be forthcoming. There was no testimony by PEI witnesses that they were ever told that new monies would be forthcoming. Even if plaintiff had demonstrated some good reason to set aside the stipulation, which it has not, the Letendre notes are therefore not contrary to it. Nor has plaintiff argued that it was privy to those notes at any time prior to the institution of this suit. The court finds, therefore, that the defendant did not occasion plaintiff's expenses after July 11 by holding out the possibility of new funds.

The plaintiff also contends, however, that it incurred expenses between July 1981 and January 1982 because of its concern that DOE had the right to insist on contract completion. The court concludes that plaintiff cannot recover on this basis.

First, as discussed earlier, the parties were not operating pursuant to a contract stop work order. The defendant made it clear that the reason it agreed to plaintiff's decision to stop work was because of the mutual erroneous perception that there were no contract funds left. Whether work was over because of plaintiff's demand for a termination, or because funds were apparently exhausted, the result is the same—both parties agreed for reasons independent of the contract stop work clause that no work should be done. Thus, plaintiff cannot rely on an obligation by defendant to act in accordance with that provision.

Second, even if the question were the reasonableness of Penberthy's mistaken assumption that PEI had to maintain itself in a state of readiness to perform at the end of 90 days, the court finds that PEI was never *willing* to so perform. While defendant clearly held out the possibility of allowing plaintiff to "work off" any possible overpayment, plaintiff consistently rejected that offer. Plaintiff's position from the onset of the financial difficulties was that it wished to terminate. In its letter of November 2 to DOE, PEI specifically addressed the possibility of finding additional funding:

The auditor was here....

The general impression he had was that the overhead rates ... were too high. If his information is sustained, there will be extra money available from that which has already been paid to us.

But please don't count on this overly much.... I expect our beginning, limbo, and ending overheads will completely use up any overhead-return figure generated by the auditor.

In any case, we certainly are not going to borrow in order to do work for the DOE. *If you want further work done, please*

---

13. Plaintiff's responsibility in this respect is clear. *Datex, Inc.,* ASBCA No. 24794, 81–1 BCA ¶ 15,060 (1981); *Forge Aerospace, Inc.,* ASBCA No. 22157, 79–1 BCA ¶ 13,746 (1979); *General Time Corp.,* ASBCA No. 18962, 75–2 BCA ¶ 11,-462 (1975).

*provide additional funding.* (Emphasis added.)

The letter is consistent with what Penberthy told PEI's board of directors in December:

> The contract officer then asked us to pay for moving the furnace to Idaho and to do and pay for the cost of preparing re-installation drawings. Neither of these tasks is in any of the contracted Tasks nor even in our original proposals. *We are willing to do these new tasks at an agreed fixed price.* (Emphasis added.)

Moreover, plaintiff stipulated to its unwillingness to work off the overpayment. In paragraph 67c of the JCSF, the parties represent that, "[a]t no time did PEI agree to perform, without additional compensation, work in addition to that which it had performed as of June 23, 1981."

Since by stipulation and evidence plaintiff would do no more work without more money, and since defendant never offered more money, there can be no serious argument that plaintiff's "holding itself in readiness" was defendant's responsibility.

PEI's conduct during October and November 1981 also belie its assertion that it was operating under the assumption that a stop work order had been issued. This is apparent from Penberthy's letter of April 22, 1982 to DOE. He writes that the "first" stop work order expired on September 30, 1981. And while he states that the "contract requires us to resume work at [expiration]," PEI plainly had not commenced the remaining tasks as of the date of the letter. Nor did it commence work when the government audit showed that rather than being over budget, the contract was underspent. Penberthy's position is made clear in his report to PEI's Board of Directors of December 21, 1981: "we have already given DOE a fantastic bargain.... There is no reason to give the DOE even more of a bargain."

Finally, the court rejects plaintiff's post July 11 costs for failure of proof. Both Penberthy and Hotaling testified that 17 or 18 workers were engaged on the DOE contract in question. Penberthy testified that he would have cut his staff from 27 to 7 if the contract had truly been terminated, and that in February 1982, he did that. The court finds this testimony unpersuasive. First, it does not square with Hotaling's testimony. When asked how many workers could have been released in July, he stated:

> There would have been probably four or five that I could have eliminated directly. It's a little hard to say. I could have shifted them over to another job for a short time and that would have been a decision we would have had to sit down and whether we shift them over for just a short time or whether we eliminate them now and let someone else pick up the slack. (Tr. 479)

The clear import of this is that only four or five workers were working exclusively on the DOE contract, and even they might have been useable on another task. Penberthy's delay in mitigating his costs was also unreasonable. If he genuinely anticipated an order at the expiration of 90 days from DOE to either commence work or to terminate, Penberthy should have recognized at least by mid-October that it was not forthcoming.

The same analysis applies with respect to plaintiff's related claim for direct labor and material costs during this period. While plaintiff could theoretically be entitled to recover unavoidable maintenance costs, proof on this claim was for all practical purposes nonexistent. Hotaling briefly stated that there was "some minor clean-up" and Penberthy testified that the drain was replaced. Neither witness explained why the work had to be done in the face of defendant's agreement that plaintiff would stop all work, nor did they testify to any understanding with defendant that the work would be done. Quite the contrary. In his November 1, 1981 telegram to DOE, Penberthy warned about overhead costs, but did not mention the need for direct labor or material expenditure.

Virtually all of the charges claimed are for the period December 1981 through Jan-

uary 1982. Plaintiff's exhibit 114 is, in part, a description of work done during this period. Initially it can be observed that although the work is described, the rationale is not clearly set out. To the extent that it could be argued that defendant's desire to have a working furnace moved to Idaho prompted the work, plaintiff encounters three problems of proof. First, if some of these costs are in the nature of settlement expenses, they are not clearly broken out from other costs, or distinguished from settlement expenses recovered elsewhere in this opinion. Second, PEI at this period of time was taking the position that it would not agree to the request to do additional work to reduce defendant's claim, absent further funds. That being the case, any expenses PEI incurred were undertaken at its own risk. Finally, plaintiff's exhibit 44, which is PEI's summary of a telephone conference with Letendre, lists a request by him for estimates for the costs of preparing the furnace for shipment, for shipment to Idaho, and for preparing "as built" drawings. There is no evidence that plaintiff prepared those estimates, much less that it did the work.

The court concludes, therefore, that plaintiff is not entitled to recover its post July 11, 1981 charges for "unabsorbed overhead" or for direct labor and material costs not associated with settlement. Having disallowed such recovery, it is unnecessary to address plaintiff's contention that the amount of any such recovery should be computed pursuant to the so-called "Eichleay" formula.

### E. Settlement Costs

█ Plaintiff seeks $11,804.00 in settlement costs. According to Hotaling, these costs, shown on plaintiff's exhibit 119, are for labor in working up information sought in connection with the 1981 audit, and for travel costs, employee time, and legal and accountant expenses in connection with the January 1982 discussions concerning possible additional work and removal of the furnace.

Settlement expenses are one type of termination cost a contractor may recover, 41 C.F.R. § 1–15.205.42(f) (1982), unless the termination was for default. Here there is no allegation that the contract was terminated for default. Indeed, defendant made no effort to rebut or question the expenses. Initially, plaintiff's request to Letendre for payment of these expenses was rejected because, given the facts presented by plaintiff, there were no funds left available in the contract. Even assuming that were a basis for rejecting such expenses, it is not operable here since the court's acceptance of defendant's overhead rates puts plaintiff's costs and fee well below the obligated amount.

The court concludes that the expenses are recoverable. Hotaling's time spent providing information to DCAA auditors and costs associated with the early January negotiations over the amount claimed by defendant fall within the terms of the regulation. Plaintiff is also entitled to G & A overhead on Hotaling's time, *Thiokol Chemical Corp.*, ASBCA No. 17544, 76–1 BCA ¶ 11,731 (1976), although not at the 41.76% rate sought by plaintiff. The court does not have any evidence of 1982 overhead rates other than those developed through the James method. In the absence of any better evidence, the court will utilize the overhead rate developed by the DCAA, 27.5%, which would be applicable in any event to the bulk of this claim, and which would be no more than two weeks short of the last expenses claimed.

Consequently, plaintiff is entitled to recover for Hotaling's time and for G & A overhead in the amount of $5,141.00, and travel and professional services in the amount of $6,088.00, for a total recovery on this claim of $11,229.00.

### F. Defendant's Claim for Costs of Attempted Removal

█ Defendant seeks $7,881.76 as costs it incurred solely due to plaintiff's refusal to allow the furnace to be removed in January 1982. Plaintiff has not challenged de-

fendant's proof on the quantum of damages.

The contract establishes at GP–19 that defendant held title to the furnace. Nor does plaintiff dispute its obligation under that provision to turn the furnace over to the government. The contract does not, however, speak directly to whether plaintiff's actions in not allowing defendant's agents to remove the furnace on January 18 were appropriate.

Defendant argues that PEI's actions were unreasonable in several respects. First, it points out that Penberthy was aware before January 18 that DOE would send personnel to take possession of the furnace. This is borne out by JCSF ¶ 67. It points out that Farley Warren and Charles Jenkins visited the PEI facility on January 14 and told Hotaling they would be back the following Monday to take out the furnace. Hotaling did not notify them of any preconditions to removal. Moreover, Hotaling testified that on the 14th he telephoned Penberthy and told him of the visit and impending removal. In response, plaintiff contends that Penberthy's actions were reasonable in light of PEI's obligation under the contract to safeguard the equipment, and in view of the inability of Jenkins and Warren to satisfy Penberthy's concerns.

Although admittedly a close issue, the court concludes that defendant has not satisfied its burden of proof that plaintiff's actions were unjustified. Initially it can be observed that the contract contemplates that instructions regarding delivery of the furnace would be in writing, and would emanate from the contracting officer, Letendre. GP–19 F, G, & I. It also made PEI liable for any damage which might occur to the furnace as a result of not following written directions.

The court also makes the following findings: Hotaling told Warren and Jenkins that though he anticipated no problem, Penberthy and not Hotaling would have to give final approval;[14] none of the work crew that arrived on the 18th could identify themselves as agents of DOE; they did not have with them written authorization to remove the furnace on behalf of DOE; and they were unable to provide written assurances that PEI would be protected from liability in the event of an accident. The court further finds that Penberthy's stated concerns were objectively legitimate and genuinely advanced, and that they were not fully addressed by the telephone conference with Letendre or the telex of January 18. Although the telex authorized Warren and Jenkins to proceed, it did not address Penberthy's concern about their competence, or the question of liability insurance.

It is undisputed that removing the furnace was a potentially hazardous operation. Penberthy testified that the furnace was 16 feet tall, weighed 25 tons, and was top heavy. It was connected by several heavy cables to an electrical source. In addition, defendant's agents proposed using acetylene torches to remove electrodes and other attachments to the furnace. In the immediate vicinity of the furnace were high pressure gas lines and electrical connections. Penberthy testified that although moving the furnace would be a fairly normal operation, it carried the risk of significant danger if not done properly. Since the center of gravity was so high, improper handling with a crane or fork lift could topple the furnace into the gas and electric lines.

---

**14.** Warren and Jenkins both testified that Hotaling did not tell them they had to talk to Penberthy to get permission to remove the furnace. Hotaling testified directly to the contrary. The court finds Hotaling's testimony more persuasive for two reasons. First, the court discounts Jenkins' recollection. While being very positive initially about how the furnace was removed, his ultimate recollection and others' testimony were directly contrary. Hotaling, on the other hand, the court finds to have been consistently credible and candid. When unsure he said so; when his testimony set back plaintiff's argument, he did not equivocate. Moreover, his recollection is more consistent with JCSF No. 69 which states that he told Warren and Jenkins he was not a company officer.

In sum, the court concludes that Penberthy's actions were not without justification and that defendant has not demonstrated an entitlement to recover these costs.

### III. Conclusion

In summary, the court rules as follows:

I. Plaintiff's claims.

A. Plaintiff prevails on its claims for

1. precontract costs in the amount of $30,738.00.

2. additional contract costs in the amount of $33,007.00.

3. settlement expenses in the amount of $11,229.00.

4. unpaid fee in the amount of $25,581.00.[15]

B. Plaintiff does not prevail in its claim for costs for the period July 11, 1981 to January 19, 1982.

II. Defendant's counter claims.

1. Defendant prevails on its claim for reimbursement of improperly paid overhead in the amount of $134,728.00.

2. Defendant does not prevail in its claim for costs due to the unsuccessful removal attempt.

In view of these findings and conclusions, the parties' respective liabilities are as follows:

| | |
|---|---|
| Amount previously paid | $892,852.00 |
| Additional amount plaintiff entitled to recover | 100,555.00 |
| Amount defendant entitled to recover | 134,728.00 |
| Total amount plaintiff entitled to under contract | 858,679.00 |
| Difference (amount plaintiff overpaid) | $ 34,173.00 |

Accordingly, plaintiff is entitled to recover $100,555.00 on its claim; defendant is to recover $134,728.00 on its counterclaim. The clerk is directed to enter net judgment for defendant on its counterclaim in the amount of $34,173.00. Costs to be borne by each party.

**15.** Defendant has not contested this liability.