**INTEGRATED LOGISTICS SUPPORT SYSTEMS INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–166C.

United States Court of Federal Claims.

Filed July 28, 2000.

As Amended Aug. 1, 2000.

William Alexander, Ashburn, VA, for plaintiff. Maurice J. Mountain, Barton, Baker, McMahon & Tolle, McLean, VA, of counsel.

James W. Poirier, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after trial. It involves a small, but experienced, Navy support contractor which provided services to the Kuwaiti Air Force under a contract awarded pursuant to the Foreign Military Sales program. Although the Foreign Military Sales program is designed to protect both the American contractor and the foreign nation purchasing military equipment, trial revealed that the Kuwaiti Air Force indulged itself at plaintiff's expense, but its authorized representatives did not purport to bind the Kuwaiti Air Force or the Navy with respect to the specific claims in issue. Nonetheless, plaintiff adopted a course of conduct stunning in its single-mindedness, whereby equipment was shipped to Kuwait and services rendered with the legally unjustifiable expectation that plaintiff would be reimbursed for all expenses, whether authorized or not, by the Kuwaiti Air Force or the United States Navy. Because plaintiff's expectation finds no safe harbor in the law, defendant prevails.

## FACTS

Integrated Logistics Support Systems International, Inc. ("plaintiff"), was a small government-contracting firm owned by Johnny V. Carter. Plaintiff's business was primarily with the United States Navy. During the mid–1980s the Navy agreed to sell F–18s to the Kuwaiti Air Force (the "KAF") to improve its air defense capabilities and deter possible encroachments by overzealous neighbors. Pursuant to these sales, but prior to delivery, the KAF undertook with the assistance of the Navy to put the systems required for the successful operation and maintenance of an F–18 fleet in place. American military contractors were retained by the KAF and the Navy to develop and install these systems on an expedited basis. Plaintiff, on May 16, 1989, was awarded the contract for the design, procurement, and installation of the F–18 spare parts and support equipment warehousing system, a system critical to operation of the fleet.

Development and installation of the systems associated with the KAF F–18 sale were accomplished pursuant to the Foreign Military Sale ("FMS") program. The FMS program was established by the Arms Export Control Act, 22 U.S.C. § 2751 (1994), to permit the United States to help friendly foreign nations purchase American defense articles and services. Under the program, loans are provided to foreign governments for the purchase of military equipment and supplies from American contractors. Most transactions under the FMS program are government-to-government sales, *i.e.*, the foreign government contracts with the United States to purchase American defense articles and services. Certain nations are permitted under the FMS program to purchase goods and services directly from American contractors. However, throughout the period relevant to this litigation, Kuwait was not.

The FMS program is supervised by the Defense Security Assistance Agency (the "DSAA"), an agency of the United States Department of Defense. Financing for these commercial contracts must be approved by the DSAA. Upon approval, the DSAA sets aside FMS credits in the Treasury to be used by the foreign governments to purchase the defense articles or services from American contractors. The military branch with which the articles and services are associated then acts as the agent of the foreign government in its dealings with the American contractors. The foreign nation is required to reimburse the military branch for the costs of contract administration and management.

The Navy operates the F–18 and therefore administered F–18 sale related contracts for the KAF. The Navy assigned contracting authority over the project to bring the newly acquired KAF F–18s online to Navy Supply Systems Command ("NavSup") and the Navy International Programs Office (the "Navy IPO"). NavSup and the Navy IPO, in turn, determined that, in accord with the FMS legal framework, the warehousing contracts necessary to complete the project would be undertaken through the American Embassy in Kuwait. After the KAF and the Navy reached an agreement, the American Embassy in Kuwait contracted with plaintiff. The United States Navy Liaison Office (the "NLO") was the representative of the United States Government on this FMS initiative and thus was an important point of contact for plaintiff. Also, Naval Air Systems Command ("NavAir") in Washington, as manager of the F–18 aircraft, was a source for information on the project. Plaintiff's contract, awarded on May 16, 1989, however, was exclusively with the American Embassy in Kuwait.

The site selected in Kuwait to house the F–18 fleet and its associated operations was Ahmed Al–Jaber Base ("AAJB"). AAJB sat in barren desert some distance due west of Kuwait City. Plaintiff was to install the material-handling system for F–18 parts in Buildings 32 and 33 at AAJB. The contract between the American Embassy in Kuwait and plaintiff contemplated performance in two stages. Plaintiff estimated that the project would cost approximately $5 million. All of the facilities and some of the equipment necessary for performance were in Kuwait at the time plaintiff commenced operations. Pursuant to the contract, plaintiff procured all the necessary tools, supplies, and additional equipment and staged it at the freight forwarder, Daniel F. Young ("DFY") in Baltimore, Maryland, for shipment. Upon arrival at DFY, these materials became the exclusive property of the KAF. Plaintiff's performance of the first segment of the contract proceeded unimpeded until the August 1990. At that time the bulk of the equipment associated with performance of the second stage of the contract remained at DFY awaiting shipment.

On August 2, 1990, Iraq invaded Kuwait, catapulting the region into the Gulf War. On the same date, plaintiff was instructed by Navy personnel to suspend contract performance immediately. Iraq surrendered and the Gulf War ended on February 27, 1991. Throughout the war contract performance remained at a standstill, while AAJB was virtually destroyed. Almost every structure was damaged beyond repair, including Buildings 32 and 33. The base also suffered the complete loss of its electrical and water supplies. Nonetheless, because the KAF provided information which was, at best, overly optimistic, neither plaintiff nor the Navy components involved knew the full extent of the destruction until the Navy undertook a site visit during September 1992.

Soon after Kuwait was liberated, the KAF, over plaintiff's protestations, ordered immediate shipment to Kuwait of the equipment staged at DFY. Upon arrival in Kuwait, the Kuwaitis unloaded these materials incompetently, and with consequent mishandling, and stored the materials in leased warehouse space at Sulaybikhat Air Base ("Sulaybikhat"). While at Sulaybikhat, but before plaintiff began performance, these materials were ravaged and some equipment was irreparably damaged. When plaintiff finally arrived in Kuwait to perform installation, plaintiff incurred significant expense reorganizing and repairing the equipment that had been unloaded at Sulaybikhat.

The onset of the Gulf War substantively changed the timing and scope of the second segment of contract. As Buildings 32 and 33 were destroyed, performance, as originally contemplated, was no longer possible. In the aftermath of the conflict, plaintiff, the Navy, and the KAF met to discuss the status of the project. Due to the damage at AAJB, the parties agreed that the best course was to award a new contract. The Navy and the KAF advised plaintiff that a new contract would be consummated in short order and impressed upon plaintiff that, once the order to proceed was given, time would be of the essence. Significantly, the Navy transferred contracting authority for the project from the American Embassy in Kuwait to Naval Regional Contracting Center Philadelphia ("NRCC"). At AAJB the KAF and NRCC selected Buildings 30A and 30B—as replacements for destroyed Buildings 32 and 33—to house the project.

On April 1, 1992, NRCC sent plaintiff a request for quotations ("RFQ") for the second segment of F–18 warehousing project. This was the first action regarding the post-war contract. The statement of work (the "SOW") in this RFQ was identical to the SOW in the pre-war contract in many respects. On May 15, 1992, plaintiff responded with a draft proposal—which appears to have been incomplete or only partial—but then heard no further word for some months.

■ On September 2, 1992, plaintiff's personnel, including Mr. Carter, met with NRCC officials, including Contracting Officer Donato Consalvi, to discuss the project. Mr. Consalvi's notes to the file regarding this meeting indicate that NRCC told Mr. Carter that the project was on a "fast track" and that a letter contract was likely to be issued in relatively short order. A letter contract is an interim agreement that allows the contractor to begin performance prior to issuance of a definitized contract. On a hand-drawn time line in his notes to the file, Mr. Consalvi predicted the contract would issue around October 15, 1992. Mr. Carter relied on this representation, and plaintiff proceeded on its own as if the contract would issue on or around that date. On September 4, 1992, plaintiff submitted its second draft proposal, which was not admitted into evidence.

The site activation meeting at AAJB began on September 25, 1992. Prior to plaintiff's arrival, participants in the meeting agreed to delete the "superflat" floors requirement for Buildings 30A and 30B—a requirement that was critical to successful operation of the warehousing system. Plaintiff's personnel were not informed of this change upon their arrival at the meeting, nor for some time thereafter. They arrived at the meeting on September 30, 1992, and were shocked by the site conditions at AAJB, which differed considerably from the representations of KAF officials during this time period. The base was littered with unexploded ordnance, and the few base facilities which remained standing had been cannibalized and/or gutted during the war. Plaintiff's personnel described the conditions as "bare base"—meaning that the support facilities at AAJB were inadequate to complete the project and that plaintiff would be required to transport all the materials necessary for performance to Kuwait. This visit dramatically altered Mr. Carter's view of the scope of the project.

A major issue of concern for plaintiff, in the wake of the site activation meeting, was the lack of potable water and useable electricity at AAJB. KAF officials had represented that water and electricity were available on the base, but, as plaintiff discovered at the site activation meeting, these representations were not true. Furthermore, little prospect appeared of restoring these services to AAJB in the near term. Later, when it became apparent that these services would not be restored before the period set for contract performance, plaintiff brought these deficiencies to the attention of NRCC. NRCC remedied the problem by allocating funds for accessing water and installing step-down transformers. Plaintiff's employees carried drinking water from their hotel each day to the site. Thus, these deficiencies did not cause any delay in contract performance, and no additional expenses were incurred by plaintiff.

In light of the conditions that plaintiff discovered at the site activation meeting, Mr. Carter reassessed plaintiff's requirements for

contract performance. He decided that the conditions necessitated procurement of additional equipment that was not considered necessary for the project before the war. Plaintiff's third draft proposal, sent to the NLO on November 14, 1992, represented a dramatic change from previous proposals. Some changes were because Buildings 30A and 30B were different sizes and structures from the buildings that originally were identified to house the project. More changes were necessary to the proposal as a result of the lack of support facilities available at AAJB after the Gulf War. Significantly, plaintiff undertook to resolve the deficiency in suitable administrative office space, tool storage, and medical facilities though the use of "shelters." Shelters are standard-size shipping containers with their interiors outfitted to suit a broader purpose. Plaintiff proposed to use a total of six shelters for this project. Three shelters were to be outfitted for administrative functions—one would be used at Sulaybikhat, and two at AAJB. The other three shelters were outfitted for tool storage and would be used at AAJB. Plaintiff's revised proposal price totaled approximately $5 million. Shelters accounted for more than $1 million of this total. Each of plaintiff's proposals included 10% for profit and 5% for G & A.

Soon after submission of the third proposal, plaintiff began negotiating with vendors to prepare for performance. At this point plaintiff began spending money on the project—for which plaintiff believed a letter contract would issue shortly. No credible evidence was presented that NRCC personnel knew, or should have known, that plaintiff was negotiating with vendors or spending money. Beginning on January 7, 1993, plaintiff sent various new equipment, including shelter parts, to DFY to process and package for shipment to Kuwait. Shelters were assembled and outfitted at DFY's facilities over the course of the next six months.

Again in late 1992, it appears that the KAF contacted the Navy to renew plaintiff's sole-source authorization with the purpose of moving the project along at an expedited pace. While various Navy officials misled plaintiff as to the timetable for issuance of the letter contract, no credible evidence established that plaintiff was aware of the KAF's authorization, or that NRCC gave plaintiff orders to proceed.

On January 21, 1993, NRCC sent plaintiff a request for certified proposal ("RFP"). Plaintiff responded on February 2, 1993, with its first certified proposal which was priced at approximately $5 million. In response to another NRCC RFP, issued on February 17, 1993, plaintiff sent a similar proposal to NRCC on February 25, 1993. Neither proposal differed substantively from the proposal developed in response to the November RFQ.

Although both February 1993 proposals included the costs of six shelters, the material cost entries relating to shelters were broken out into the costs for each individual part and not presented under a common subheading. Instead, the entries related to shelters were mixed into other cost subheadings and assigned nondescript titles. At trial defendant proved that the task of pulling together the costs of shelters, had a reviewer known to look for them, would have been Herculean. This problem was exacerbated by the fact that the proposal itself did not mention shelters or explain the need to use them. Consistent with these findings, although both proposals included the costs of shelters and the materials used to outfit them, NRCC officials testified credibly that they were unable to ascertain from these proposals that plaintiff planned to use shelters. Plaintiff failed to offer evidence to contradict these assertions.

Consistent with defendant's position throughout this litigation, Contracting Officer Peter A. Parrott testified that NRCC was never aware that plaintiff contemplated the use of shelters to complete contract performance because plaintiff failed to broach the topic in their discussions and never sought NRCC's approval. Mr. Carter testified that the use of shelters was brought to the attention of NRCC on many occasions. However, Mr. Carter's testimony was ambiguous, evasive, and, at times, contradictory. Of substantial import, Mr. Carter's assertion concerning shelters was not supported by any probative documentary evidence. As a con-

sequence the court does not accord Mr. Carter's testimony weight on this point. Mr. Carter's associate, Garrett N. Tatum, plaintiff's former Vice President, also testified to his belief that discussions concerning the use of shelters occurred with NRCC and generally supported Mr. Carter's assertions. However, on cross-examination it was revealed that Mr. Tatum's beliefs were informed only by Mr. Carter's representations, and Mr. Tatum had not personally discussed the use of shelters with NRCC personnel. While plaintiff's remaining witnesses were unable to give specific testimony on this point, the prevailing theme was that Mr. Carter had assured them that shelters were being approved, although none had personal knowledge on the point. Plaintiff presented no evidence that any documents referencing the use of shelters were ever passed to NRCC. For the court this is the decisive factor. As shelters represented such a significant portion of the total project costs (approximately 20%), it is unreasonable that no document alerted NRCC that shelters were being contemplated or referenced their use.

Also on January 21, 1993, Contracting Officer Parrott of NRCC ordered a comprehensive review of plaintiff's accounting system by the Defense Contract Auditing Agency ("DCAA"). After receiving inconclusive results, Mr. Parrott ordered a follow-up accounting review on March 4, 1993. These reviews were prerequisites to a contract award. On March 9, 1993, DCAA issued its report noting certain deficiencies in plaintiff's accounting system. Eventually these deficiencies were remedied to the satisfaction of DCAA. DCAA's final report, approving plaintiff's accounting system, did not issue until June 9, 1993. Defendant presented no evidence that plaintiff was notified at that time that the DCAA audit was ordered or that it was a prerequisite to contract award.

On March 3, 1993, Mr. Parrott requested that NavAir prepare a detailed technical evaluation of plaintiff's proposal. Plaintiff did not know that this evaluation was occurring, and, during the evaluation, NavAir did not discuss its concerns with plaintiff. On March 22, 1993, NavAir issued its technical evaluation report to NRCC. The report amounted to a somewhat cryptic list of questions and proposals for changes. The content of the report reveals that NavAir reviewers were not familiar with base conditions at AAJB. The NavAir report eventually was transmitted to plaintiff on April 13, 1993.

On March 16, 1993, the NLO, pursuant to a recommendation from the KAF, proposed removal the so-called "I level/O level" work from plaintiff's contract. This work consisted of compiling, filing, and inventorying all the F–18 spare parts which were stored in various locations around Kuwait and totaled approximately $2 million in value. Pursuant to the NLO's recommendation, NRCC amended the contract SOW on March 31, 1993, to reflect this reduction in the scope of the project. Testimony at trial suggests that plaintiff was not informed of this significant change to the SOW until perhaps as late as April 27, 1993. The "I level/O level" work later was given to one of plaintiff's competitors, who was on site serving as a contract advisor to NRCC. The dubious circumstances surrounding this SOW reduction further strained already difficult relations between plaintiff and NRCC.

On April 27, 1993, and again on May 12, 1993, NRCC issued RFPs to plaintiff under the revised SOW—without "I level/O level" work. On May 7, 1993, and May 17, 1993, respectively, plaintiff responded to NRCC with new proposals. Both estimated costs for the project at approximately $4.1 million. Unlike prior proposals, cost entries related to shelters were omitted completely from the materials lists submitted with these proposals. Plaintiff still had not notified NRCC that it was procuring materials or incurring costs, although, by this point, plaintiff had already spent in excess of $2 million preparing to perform.

Many concerns, including those expressed in the NavAir report issued on March 22, 1993, prompted Mr. Parrott to request a meeting with plaintiff to discuss its most recent proposals. On May 27, 1993, plaintiff's personnel traveled to Philadelphia to meet with NRCC personnel. Plaintiff's personnel "fully expected" to sign the letter contract on that date and were unprepared to

discuss the technical evaluation of their proposal. Again, it appears that this expectation was based exclusively on the representations of Mr. Carter. While virtually every item in the May proposals was discussed at the meeting, the items which spurred the most debate were the number of tools and medical supplies. The discussion was contentious and heated. It is probable that shelters were not discussed during this meeting because they did not appear in the materials list in the May proposals. Plaintiff's personnel reluctantly agreed to take many opposed items out of the materials list, but continued to believe they would be reimbursed for such items because they were necessary to performance. According to NRCC personnel, plaintiff's agreement to remove these items from the materials list signified an understanding that these items would not be procured and, if they were, the costs for these items would not be reimbursed. According to plaintiff's personnel, they made clear that the opposed items were absolutely imperative, that the items would be procured and used, and that plaintiff expected to be reimbursed. Plaintiff's personnel further testified that they made clear during this meeting that shelters would be used and that plaintiff had already spent substantial sums on materials now disputed. The relevant Navy personnel, including Mr. Parrott, strenuously disagreed, claiming that they never discussed shelters, much less agreed to their use in connection with this project.

At the May 27, 1993 meeting, Mr. Parrott demanded that plaintiff lower its profits on the project from 10% to 7%. Each prior proposal had included a rate of 10% for profit. NRCC had not objected to that rate in the past. Nonetheless, plaintiff agreed to lower its profit rate to 7% out of fear of financial distress.

On June 1, 1993, plaintiff submitted a revised proposal to NRCC based on changes discussed during the May 27, 1993 meeting. On that same date, plaintiff requested from NRCC advance payments of $2.3 million in pre-contract costs. Plaintiff was experiencing financial problems and needed this infusion of funds to stay afloat. Despite its litigation position, at trial plaintiff failed to prove that it notified NRCC that it was spending in furtherance of contract performance prior to this date. On June 9, 1993, NRCC responded to this request for advance payments by asking plaintiff to detail its expenses to date and to remove costs that were outside the SOW. Plaintiff agreed to do so, apparently still believing that removed costs would eventually be recovered. On June 11, 1993, NRCC authorized payment of the reduced costs requested in the amount of $598,488.00. A later June proposal followed reflecting these changes.

On June 15, 1993, NRCC finally awarded the letter contract to plaintiff. The contract stated the intention of the parties "to negotiate a Cost Plus Fixed Fee contract" within 60 days. The contract also contained a limitation of government liability of $1.5 million and, conspicuously, set the "total Not To Exceed (NTE) amount [at] $3,600,000.00." On that date Mr. Carter, accompanied plaintiff's employees Mr. Tatum, David L. Lejeune, and William O. Howe, traveled to Philadelphia and signed the contract. The contract included a "Limitation of Government Liability" clause of $1.5 million and an overall price ceiling of $3.6 million. Plaintiff already had spent at least $2.3 million and knew that it would not be able to complete performance within these financial limitations. However, plaintiff's personnel viewed the contract as "cost-plus," and apparently assumed that all expenses which plaintiff could prove that it incurred would be reimbursed, including those previously rejected by NRCC.

By mid-June 1993, most of the materials that plaintiff intended to take to AAJB had been staged at DFY. Plaintiff made arrangements for shipping and, on June 23, 1993, had the materials loaded onto outgoing vessels. Some weeks earlier the KAF apparently became concerned that plaintiff was seeking to exceed the scope of the contract and bill the KAF for work outside the SOW. Without plaintiff's knowledge, the KAF instructed DFY to hold all shipments pursuant to this contract until approved by the KAF. Accordingly, DFY notified the KAF of plaintiff's arrangements for shipment on June 23,

1993. Fearing that materials outside the SOW were included in these shipments, the KAF ordered an immediate halt to shipment of plaintiff's materials, presumably to confirm the contents of the shipment. Upon discovering this hold, plaintiff contacted the Navy IPO, rather than NRCC, to attempt to have the matter resolved. The Navy IPO was not as familiar with the circumstances surrounding this contract as NRCC and could not understand why the KAF would have authority to put a hold on shipment of materials. On this basis the Navy IPO contacted DFY to override the hold and the materials were shipped on June 24, 1993. On June 25, 1993, NRCC and the KAF discovered that the hold had been lifted and the materials shipped. NRCC officials were furious that plaintiff had not contacted NRCC regarding the shipment hold, as NRCC—not the Navy IPO—was the contracting authority. The KAF also was furious and demanded that plaintiff bear the shipping costs for any materials which were eventually determined to be out of the scope of the SOW. These events prompted a series of communications among plaintiff, NRCC, and the KAF regarding the materials shipped. In one such communication, Mr. Carter stated that he had informed the KAF that the items shipped but "not listed in the contract are 'contractor support equipment,'" which are "not being charged to the contract."

Plaintiff's advance team arrived in Kuwait on July 18, 1993. The bulk of plaintiff's personnel arrived soon thereafter. From their living quarters in a Kuwait City hotel, which was described by as "five star," plaintiff's personnel were bused to their respective work stations each morning. Because suitable drinking water was unavailable on site, plaintiff's personnel carried bottled water from the hotel. Plaintiff assigned a handful of men to Sulaybikhat to inventory equipment and to arrange for its transport to AAJB. The remainder of plaintiff's personnel were assigned to the warehouse installation at AAJB. Because of the oppressive temperature common in Kuwait during the summer months and the continued presence of unexploded ordnance in AAJB, plaintiff was forced to take special precautions to ensure the safety of its personnel. Lt. Cmdr. Rodg-

er D. Lord, the Contracting Officer's Technical Representative, the top Navy officer at AAJB, worked with plaintiff to address the myriad issues encountered during contract performance.

Although plaintiff was able to assemble its personnel in Kuwait and to begin work on the project, some project materials remained held up at DFY awaiting shipment, including several shelters. Plaintiff identified materials that were "critical" to performance with the hope that they could be air shipped immediately to Kuwait. NRCC eventually approved shipment of these materials, which arrived sometime after August 5, 1993. Upon receipt plaintiff assembled these materials on site and put them into use. Significantly, during this period plaintiff was able to keep the project on schedule and ultimately to complete performance on time, without the benefit of these shelters during the first three weeks of operation. Lt. Cmdr. Lord's testimony regarding shelters supports the inference that can be drawn from their delayed arrival. While admitting their superiority to more traditional alternatives, Lt. Cmdr. Lord believed that shelters were unduly elaborate and, as he told plaintiff at the time, an unnecessary extravagance. Lt. Cmdr. Lord further observed that other contractors were able to operate quite effectively at AAJB without the use of shelters.

Included in the equipment plaintiff inventoried at Sulaybikhat was furniture for a conference room and appliances for a kitchenette. Plaintiff had these materials shipped to AAJB and installed a conference room complete with table and chairs, a kitchenette complete with sink and cabinetry, and a marble bathroom with shower. The SOW did not include these items—although the 1989 contract had—nor did the master drawings associated with the current project. Moreover, plaintiff was unable to prove that the inclusion of these rooms was discussed with or agreed to by NRCC. On a number of occasions during the installation, Lt. Cmdr. Lord expressed the view to plaintiff, particularly to Messrs. Carter and Howe, that this work was outside the scope of the SOW. He testified that plaintiff was not deterred by his admonitions. Letters from plaintiff on Au-

gust 6 and 14, 2000, indicate that plaintiff itself understood that the conference room and kitchenette were outside the scope of the SOW.

The contract was finally definitized on November 18, 1993, in Crystal City, Virginia. On November 20, 1993, plaintiff notified NRCC that the project had been completed. Plaintiff's personnel soon thereafter left Kuwait. During the next three months, plaintiff made a number of unsuccessful attempts to lobby KAF officials to accept and to pay for shelters. The Government ultimately paid plaintiff $3.6 million, the full amount allowable under the contract's overall price ceiling. In 1994 and 1995 plaintiff submitted claims to the contracting officer in which plaintiff segregated its costs. The contracting officer paid plaintiff an additional $622,000.00 as a result of these claims. Defendant's counterclaim asserts that plaintiff was overpaid by at least $1 million.

## DISCUSSION

### 1. Recovery of precontract costs

■ Plaintiff contends that it is entitled to recover as precontract costs all its expenses, despite the limitation of liability and price ceiling set forth in the letter contract. 48 C.F.R. (FAR) § 31.205–32 (1994), which governs the recovery of pre-contract costs, provides:

> Precontract costs are those incurred before the effective date of the contract directly pursuant to the negotiation and in anticipation of the contract award when such incurrence is necessary to comply with the proposed contract delivery schedule. Such costs are allowable to the extent that they would have been allowable if incurred after the date of the contract.

Thus, three requirements must be satisfied in order to recover precontract costs: 1) Such costs must be incurred prior to the contract definitization, 2) they must be incurred directly pursuant to negotiations with the contracting authority, and 3) the costs

would have been allowable if incurred after the contract was delivered. *See Best Foam Fabricators, Inc. v. United States*, 38 Fed.Cl. 627, 639 n. 10 (1997); *Penberthy Electromelt Int'l, Inc. v. United States*, 11 Cl.Ct. 307, 315 (1986). No dispute exists that plaintiff's costs were incurred prior to contracting.

■ The principal legal issue in this litigation is whether these costs were made "pursuant to the negotiation and in anticipation of the contract award." The phrase "pursuant to the negotiation" contemplates communication between the contractor and the contracting authority leading to mutual agreement on the work to be performed.[1] *See Penberthy Electromelt*, 11 Cl.Ct. at 316. A prerequisite for communication leading to a shared understanding and bilateral agreement, where the contractor proposes an expense, is that the contracting authority unambiguously be informed of the extent and costs of the proposed work before the contractor proceeds. *See United Technology Center*, ASBCA No. 12,007, 68–2 BCA ¶ 7,350, 1968 WL 653. Then the contracting authority may evaluate the proposed work and decide whether it is desirable and/or cost effective. An expenditure is not made "pursuant to the negotiation" when the contractor decides unilaterally what work is required, performs the work, and then submits an invoice.

■ To protect the public fisc, the regulation mandates that a contractor seek approval from the contracting officer prior to spending. This approval, at the very least, requires the contractor to inform the contracting authority of the proposed work, thereby putting the Government on notice, and to await government approval. Without notice the contractor drives the process, and the Government is at the contractor's whim. Without approval, the Government has no say in how monies are spent and no check to prevent abuse. This is not the procedure established by FAR § 31.205–32. That regulation protects the contractor by promising reimbursement for legitimate, sanctioned ex-

---

1. The scope of work throughout the 10 months prior to issuance of the letter contract changed a number of times. The removal of the I level/O level work is one example. In determining whether plaintiff may recover a particular cost, that cost must be assessed in light of the parties' mutual understanding of the scope of the contract when the expenditure was incurred.

penses incurred prior to contract definitization, and protects the Government by obligating the contractor to obtain approval for such expenditures from the contracting authority prior to spending.

A survey of the case law, as well as common sense, supports this interpretation of the regulation. In *United Technology Center* the contractor's claims for precontract costs were denied because the board found that these costs were not discussed with the contracting authority during negotiations. In *Codex Corp.*, ASBCA No. 17,983, 74–2 BCA ¶ 10,827, 1974 WL 1783, the contractor's claims for precontract costs were denied because negotiations with the contacting authority did not begin until well after costs were incurred. In contrast, in *Radant Technologies, Inc.*, the Board held that the contractor's expenses were incurred "[d]irectly pursuant to negotiation" because the incurrence of the costs in dispute was "preceded [by] continuing discussions between the parties" relating to those costs. ASBCA No. 38,324, 91–3 BCA ¶ 24,106, at 120,657, 1991 WL 129837. These cases, while not binding, stand for the proposition that the contractor and contracting authority must reach a shared understanding before the costs are incurred, in order for the contractor to recover the costs.

Most persuasive is *Penberthy Electromelt*, in which plaintiff's claims for precontract costs were ultimately successful. A determinative fact in the court's analysis was that the parties had reached a common understanding regarding the work to be performed. "During the period of the negotiations plaintiff informed defendant of the need to order [the] items, pursuant to which the costs at issue were incurred, and *defendant agreed to fund their purchase* ahead of schedule." *Penberthy Electromelt*, 11 Cl.Ct. at 316 (emphasis added). These cases unqualifiedly support the proposition that, to comply with the regulations governing recovery of precontract costs, the contractor must obtain the Government's prior approval for expenditures.

■ In the case at bar, plaintiff failed to prove that the Navy agreed to any specific precontract expenses. Worse still, plaintiff did not prove that it put the Government on notice that expenditures were being made. Notice is a prerequisite to reaching a bilateral agreement. The regulation requires that a contractor document its proposed costs to the contracting authority and await approval. Sound business judgment and the law require notice, as well. Instead, plaintiff proceeded without NRCC's consent, determining unilaterally the proper course and materials necessary for performance. Having completed the project on its own terms, despite the Navy's misgiving concerning plaintiff's course expressed at virtually every opportunity, plaintiff now argues that it was given *carte blanche*, and that all of plaintiff's expenditures, which it determined were appropriate by fiat rather than agreement, must be reimbursed. No legal principle in this area of the law supports such an arrangement.

Plaintiff misused much of its trial time detailing the inordinate delays that it encountered before NRCC awarded the contract and the inattention and general incompetence of the various Navy components involved in this procurement. Plaintiff proved, for the most part successfully, that the contracting authority's execution of its responsibilities was clumsy and without deliberate speed. The passivity of NRCC officials permitted the KAF to exert a significant influence on the project, which was the source of confusion and unnecessary expense. That NRCC was less than successful in keeping plaintiff informed and in responding to the contractor's needs is unquestionable. The contracting officer was monomaniacal in his fixation to reduce plaintiff's profit and knowledgeable about little other that his own strategy of containment. However, conceding the deficiencies in the Navy's management of this contract, plaintiff has not made out a case that would entitle plaintiff to recover its costs. Plaintiff's glaring failure to put the Navy on notice and to obtain the Navy's agreement was the primary cause of its losses. Rather than stand at the ready and await formal approval, plaintiff chose to spend and assume the risk that the Navy would later decline to absorb the costs. Plaintiff cavalierly proceeded, secure in the

belief that performance would be accomplished more efficiently unencumbered by the Navy bureaucracy and FAR procedures. Efficiency, however, is not the standard for recovery of precontract costs. The law requires that the contractor inform the contracting authority and obtain formal approval for costs that it intends to charge to the contract before making expenditures. Plaintiff failed to meet this requirement.

### 2. Effect of limitation of liability and price ceiling

Assuming that plaintiff had satisfied the requirements for recovery of precontract costs, plaintiff confronts the contract's overall price ceiling because it already has been reimbursed up to that amount. The use of undefinitized contract actions are limited to exigent circumstances in which the "negotiation of a definitive contract action is not possible in sufficient time." FAR § 217.7403. A letter contract, as an undefinitized contract action, is a "preliminary contractual instrument that authorizes the contractor to begin immediately." FAR § 16.603–1. Despite the requirement that "a letter contract should be as complete and definite as feasible under the circumstances," FAR § 16.603–2(a)(2), the regulation contemplates that the letter contract is an interim contract which should be replaced by a definitized agreement as soon as practicable, see FAR § 16.603–2(c). The difficulty with the case at bar may, to some extent, be attributed to the fact that definitization did not occur until plaintiff almost had completed performance; therefore, the letter contract governed virtually the entire period of work.

Plaintiff first attacks the Government's liability limitation, arguing that it failed to follow the form prescribed by relevant regulation. FAR § 16.603, the regulation governing the use of letter contracts, mandates the inclusion of the "Limitation of Government Liability" clause set forth at FAR § 52.216–24 in all letter contracts. See FAR

§ 16.603–2(d). The amount to which the Government's liability under the letter contract is limited by this clause "shall be the estimated amount necessary to cover the contractor's requirements for funds before definitization." FAR § 16.603–2(d). However, the liability limitation "shall not exceed 50 percent of the estimated cost of the definitive contract unless approved in advance by the official that authorized the letter contract." Id.[2]

Beginning on page 1, the letter contract recites the following:

### LIMITATION OF GOVERNMENT LIABILITY (APR 1984)

(a) Prior to definitization, in performing this contract, the contractor is not authorized to make expenditures or incur obligations exceeding $1,500,000.00.

(b) The maximum amount for which the Government shall be liable if this contract is terminated prior to definitization is $1,500,000.00. The total Not To Exceed amount of this contract is $3,600,000.00[.]

Beginning on page 18, the letter contract recites the following:

### LIMITATION OF GOVERNMENT LIABILITY (FAR § 52.216–24) (APR 1984)

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding $1,500,000.00 dollars [sic].

(b) The maximum amount for which the Government shall be liable if this contract is terminated is $1,500,000.00 dollars [sic]. The total Not To Exceed Amount if [sic] this contract is $3,600,000.00[.]

Excluding the final sentence regarding an overall price ceiling, the "Limitation of Government Liability" clause beginning on page 18 is identical to the clause mandated by FAR § 52.216–24 and thus satisfies the requirements of FAR § 16.603–2(d).[3] Plaintiff

---

**2.** There was no evidence presented that an official approved more than 50% of the estimated total project costs.

**3.** FAR § 16.603–2(d) only requires the incorporation of the "Limitation of Government Liabili-

ty" clause found at FAR § 52.216–24. No provision of the regulation governing letter contracts forbids the contracting officer from adding additional language, which does not contradict that

attaches great significance to the subtle differences between the two versions of the "Limitation of Government Liability" clause, arguing that an ambiguity was created, which rendered the requirements of FAR § 16.603–2(d) unfulfilled. To the contrary, the only difference between the two clauses is that the clause beginning on page 1 inserts the phrase "prior to definitization" both as an introductory phrase in the first sentence and a qualification of "terminated" in the second sentence.[4] By its nature the letter contract is a temporary agreement which is designed to operated "prior to definitization." Assuming that the parties are able to reach a definitized agreement, the letter contract's governance ends upon definitization. Thus, the addition of the phrase "prior to definitization" in the clause beginning on page 1 merely emphasizes the type of agreement being used and adds nothing to its meaning. As such, no ambiguity could have been created by the inclusion of this phrase. It is worth noting that the fact that plaintiff already had spent well in excess of the $1.5 million limitation at the time the letter contract was signed should have been a cause of great concern to plaintiff.

In addition to the language required by FAR § 16.603–2(d), the above quoted clauses also include an overall price ceiling: "The total Not To Exceed Amount of this contract is $3,600,000.00."[5] FAR § 16.603–2(b) mandates the inclusion of an overall price ceiling if the letter contract is awarded "based on price competition." FAR § 252.217–7027 recites the language used to establish an overall price ceiling under these circumstances. However, as this contract was awarded to plaintiff as a sole source, the contracting authority was not required to insert an overall price ceiling to comply with the regulation. Plaintiff urges that the inclusion of an overall price ceiling in this sole-source letter contract was an error by the contracting authority and that the clause must be voided. Of course, just because the clause was not required under these circumstances does not mean it was forbidden, and nothing in the regulation precludes the use of an overall price ceiling in sole-source arrangements.

In the alternative, plaintiff protests the effect of the overall price ceiling, contending the clause lacked the form required by FAR § 252.217–7027 and therefore is void. As plaintiff was awarded a sole-source contract, the letter contract was not subject to the requirements of FAR § 16.603–2(b), which mandate the use the overall price ceiling clause found at FAR § 252.217–7027. Accordingly, the overall price ceiling the contracting authority chose to insert was not required to take on any particular form.

Finally, plaintiff attempts to escape the overall price ceiling arguing that, as the "Limitation of Government Liability" cannot exceed half of the projected total costs of the definitized contract, the letter contract containing a $3.6 million limit accepts the possibility of, and may even require, a final definitized contract in excess of $7.2 million. Here plaintiff confuses the two clauses in question and their import. Assuming that no official has given prior authorization to exceed the 50% limitation contained in FAR § 16.603–2(d), plaintiff is correct that the "Limitation of Government Liability" clause necessarily accepts the possibility that the final definitized contract must be on the order of double that amount. However, the "Limitation of Government Liability" clause required by FAR § 16.603–2(d) was set clearly and unambiguously at $1.5 million. As required by the scheme established by FAR § 16.603–2, the definitized contract price must exceed twice that amount: $3 million. The letter contract also sets forth an overall price ceiling at $3.6 million. The overall price ceiling,

---

clause, further limiting the liability of the United States.

4. The clause beginning on page 18 twice includes the redundant "dollars" which does not appear in the clause beginning on page 1. This difference has no significance.

5. As plaintiff fastidiously notes, the two sentences actually differ slightly. The clause beginning on

page 1 states: "The total Not To Exceed amount *of* this contract is $3,600,000.00." (Emphasis added.) The clause beginning on page 18 states: "The total Not To Exceed Amount *if* this contract is $3,600,000.00." (Emphasis added.) That plaintiff attaches any significance to this obvious typographical error in the latter clause is a bit over the top.

unlike the "Limitation of Government Liability," is not a percentage of the estimated total cost of performance. Rather, the overall price ceiling is an absolute bar which is designed to put the contractor on notice that the Government will not pay an amount in excess of the stated limitation. The contract language creates no ambiguity on this point.

The overall price ceiling was set at $3.6 million. Plaintiff has presented no persuasive reason to ignore this limitation. As the Government has already paid more than $3.6 million on this contract, plaintiff is barred from recovery beyond that which it has already received.

### 3. *Total cost method*

■ Plaintiff seeks relief pursuant to the total cost method of calculating damages. Assuming that plaintiff had been able to prove liability and to avoid the effect of the overall price ceiling, defendant properly notes that plaintiff must further prove that the total cost method is available in this case. As there is no presumption that the Government is liable for all costs incurred in connection with a contract, generally the contractor must prove that each expenditure is individually allocable and allowable under the contract. *See Wilner v. United States,* 24 F.3d 1397, 1401–02 (Fed.Cir.1994). Where exigent circumstances prevent the contractor from associating specific material or labor costs with expenditures, many courts have allowed the contractor to utilize the total cost method. *See Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861–62 (Fed.Cir. 1991). Under the total cost method, damages are calculated by subtracting the amount the contractor has already been reimbursed from the aggregate amount the contractor spent on the project. *See id.*

■ Although available, the total cost method is universally disfavored. *See id.* The major weakness of the total cost method as a rule for calculating damages is its failure to distinguish between costs that result from the Government's breach and other costs. *See Boyajian v. United States,* 191 Ct.Cl. 233, 242, 423 F.2d 1231, 1235 (1970). Because the total cost method absolves a plaintiff of the responsibility to prove causation, the circumstances in which it is allowed have been circumscribed carefully. *See id.* Before the court will employ the total cost method, the contractor must demonstrate that

(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy;

(2) the contract's bid or estimate was realistic;

(3) the contractor's actual costs were reasonable; and

(4) the contractor was not responsible for any added expenses.

*WRB Corp. v. United States,* 183 Ct.Cl. 409, 426, 1968 WL 9146 (1968); *see also Servidone Constr.,* 931 F.2d at 862; *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir.1991).

Plaintiff has failed to meet the first requirement and thus cannot utilize the total cost method to prove damages. The material and labor cost at issue in this case are of the type which routinely are identified with great precision by similarly situated plaintiffs in the Court of Federal Claims. Plaintiff has articulated no explanation for why the ordinary approach to damages could not be followed in this case. Plaintiff's previous claims stemming from this contract segregated damages.

Plaintiff's complete reliance on the total cost method at trial was, under the circumstances, ill-advised. At the pretrial conference and, again, at the conclusion of the first week of trial—whereupon a month-long hiatus began—the court admonished the parties to prepare summary exhibits detailing the various damages sought by plaintiff. Defendant's fourth motion *in limine,* filed during that interval, alerted the court to defendant's suspicion that plaintiff intended not to prepare such exhibits and would seek recovery pursuant to the total cost method. *See* Def.'s Br. filed Mar. 17, 2000. Plaintiff offered no response. In ruling on that motion, the court issued an order again cautioning plaintiff that it must satisfy the requirements discussed in *Dawco* in order to utilize the total cost method. *See* Order filed Mar. 20, 2000, at 1. These warnings apparently went

unheeded. When trial continued, plaintiff presented no evidence on damages or causation; only defendant produced summary exhibits and these defeated plaintiff's claim.

### 4. *Defendant's counterclaim*

In its amended answer and setoff, defendant asserts that the Government overpaid plaintiff by approximately $1 million—the "exact amount to be established at trial." Amended Ans. filed May 10, 1999, at 12. On defendant's cross-motion for summary judgment, the court earlier awarded defendant $705,895.00 as a setoff against recovery by plaintiff. *See Integrated Logistics Support Sys. Int'l, Inc. v. United States*, No. 97–166C (Fed.Cl. Oct. 29, 1999) (unpubl.). A limited discussion of damages issues appears in defendant's pretrial brief; defendant merely "highlight[s] certain" amounts for which it seeks a setoff. Def.'s Br. filed Feb. 9, 2000, at 24. The court can describe defendant's counterclaim as seeking to recoup monies paid for labor and materials associated with moving materials from Sulaybikhat to AAJB, overpayments by the contracting officer, and unallowable consulting and travel costs.

At trial defendant's counterclaim received scant attention. Mr. Parrott, the only witness from whom relevant testimony was elicited, admitted that inventorying the materials at the Sulaybikhat base, in fact, may have been necessary. This admission appears to belie the premise of defendant's counterclaim. In the remaining two weeks of trial, no other evidence was admitted on the counterclaim. Defendant's attorney himself noted the weakness of the counterclaim during a colloquy with the court:

> MR. POIRIER [defendant's counsel]: Your Honor, I would just note at this time that this [part of Mr. Parrott's testimony] is only relevant to some sort of counterclaim because the labor, the people who were there, was fully paid.

> THE COURT: I'm sure what they did proved of use, and I'm sure you won't press that counterclaim too much.

MR. POIRIER: Yes. It seems it like it's growing fainter all the time, Your Honor.

Thus, defendant failed to introduce sufficient evidence to prevail on its counterclaim.

On March 27, 2000, the court ordered post-trial briefing strictly limited to specified issues, and defendant's counterclaim was not among them. Nonetheless, defendant devoted much of its post-trial brief to propounding its counterclaim, which cannot substitute for evidence admitted during trial.

### CONCLUSION

Plaintiff has failed to prove by a preponderance of evidence that the Navy breached the contract at issue.[6] Because defendant elected not to prosecute its counterclaims at trial, defendant is not entitled to judgment thereon. Accordingly, based on the foregoing,

The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.

---

**6.** As plaintiff is not entitled to recovery, defendant's setoff, awarded in an earlier ruling on the parties' cross-motions for summary judgment, *see Integrated Logistics Support Sys. Int'l, Inc. v. United States*, No. 97–166C (Fed.Cl. Oct. 29, 1999) (unpubl.), cannot be satisfied.